T.C. Memo. 2011-65

UNITED STATES TAX COURT

KNUTSEN-ROWELL, INC. ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 27626-07, 27628-07,   Filed March 16, 2011.
              27629-07.

Cruz Saavedra, for petitioners.

Carolyn A. Schenck and Scott B. Burkholder, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, Judge:  These three cases are consolidated for
purposes of trial, briefing, and opinion.  One case involves the
Federal income tax of John D. and Kathleen K. Rowell

---

[1]Cases of the following petitioners are consolidated
herewith:  John D. Rowell, Professional Law Corporation, docket
No. 27628-07; and John D. & Kathleen K. Rowell, docket No. 27629-
07.

(respectively, Mr. Rowell and Mrs. Rowell; collectively, the Rowells) for 2000 through 2002. Another case involves the Federal income tax of Mr. Rowell's wholly owned C corporation, John D. Rowell, Professional Law Corp. (PLC), for 1999 through 2002. The third case involves the Federal income tax of Mrs. Rowell's wholly owned C corporation, Knutsen-Rowell, Inc. (Knutsen), for 2001 and 2002.

Respondent determined the following deficiencies, additions to tax, and penalties:[2]

### Knutsen, docket No. 27626-07

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Accuracy-Related Penalty Sec. 6662[1] |
|------|-----------|--------------------------------|--------------------------------------|
| 2001 | $67,973 | $6,797 | $13,595 |
| 2002 | 14,957 | -0- | 2,991 |

[1]Respondent asserts in the answer that Knutsen is liable for the fraud penalty under sec. 6663 for 2001 and 2002 and if not, for the accuracy-related penalty under sec. 6662.

### PLC, docket No. 27628-07

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Fraud Penalty Sec. 6663[1] |
|------|-----------|--------------------------------|---------------------------|
| 1999 | $5,748 | $1,437 | $4,311 |
| 2000 | 83,784 | 8,382 | 62,838 |
| 2001 | 32,403 | 3,240 | 24,302 |
| 2002 | 76,414 | -0- | 57,311 |

---

[2]Unless otherwise indicated, section references are to the applicable versions of the Internal Revenue Code, and Rule references are to the Tax Court Rules of Practice and Procedure. Dollar amounts are rounded. The term "years in issue" refers collectively to 1999 through 2002. The term "subject corporations" refers collectively to PLC and Knutsen.

[1]Respondent determined alternatively that PLC is liable for the penalty for negligence under sec. 6662 to the extent it is not liable for the fraud penalty.

### The Rowells, docket No. 27629-07

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Fraud Penalty Sec. 6663[1] |
|---|---|---|---|
| 2000 | $85,780 | $4,289 | $64,335 |
| 2001 | 110,585 | 16,588 | 82,939 |
| 2002 | 15,079 | -0- | 11,309 |

[1]Respondent determined that the fraud penalty applied only to Mr. Rowell. Respondent determined alternatively that the Rowells are liable for the addition to tax for negligence under sec. 6662 to the extent Mr. Rowell is not liable for the fraud penalty. Respondent in the answer asserts that the fraud penalty for each year also applies to Mrs. Rowell.

Respondent asserts in an amendment to answer in docket No. 27629-07 that the Rowells are liable for increased deficiencies, additions to tax, and penalties in the following amounts:[3]

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Fraud Penalty Sec. 6663[1] |
|---|---|---|---|
| 2000 | $406,529 | $20,343 | $304,897 |
| 2001 | 340,485 | 51,344 | 255,364 |
| 2002 | 182,000 | -0- | 135,500 |

[1]Respondent asserts alternatively in the amendment to answer that the Rowells are liable for the penalty

_____

[3]The Rowells filed amended California income tax returns for 2000, 2001, and 2002 (amended California returns) reporting income in amounts greater than the amounts reported for Federal income tax purposes. The increased deficiencies (and related amounts) result mainly from respondent's assertions that the Rowells' income for 2000, 2001, and 2002 includes the additional amounts of income reported on the amended California returns. The increased deficiency (and related amount) for 2002 also results from respondent's assertion that the Rowells failed to include in their income (as a constructive dividend) a $100,000 transfer that PLC made on Mr. Rowell's behalf.

for negligence under sec. 6662 to the extent they are not liable for the fraud penalty.

Petitioners concede they are liable for the accuracy-related penalties under section 6662 (because, they state, they were negligent), to the extent they are not liable for the fraud penalties under section 6663, and for the failure to file additions to tax under section 6651(a)(1). We are left to decide the following issues:

1. Whether Knutsen overreported its income for 2001 and 2002. We hold it did not;

2. whether PLC underreported its income for 1999, 2000, 2001, and 2002. We hold it did to the extent stated herein;

3. whether the Rowells underreported their income for 2000, 2001, and 2002. We hold they did to the extent stated herein;

4. whether Knutsen is entitled to deductions of certain expenses and to costs of goods sold reported on its 2001 and 2002 Federal income tax returns. We hold it is to the extent stated herein; and

5. whether any of petitioners is liable for a fraud penalty under section 6663. We hold that none of petitioners is liable for a fraud penalty.

FINDINGS OF FACT

I. Preface

The parties submitted to the Court stipulated facts and related exhibits. We find those stipulated facts accordingly and

incorporate those facts and exhibits herein.  The Rowells, husband and wife, filed joint Federal income tax returns for 2000 through 2002.  They resided in California when their petition was filed.  Knutsen's mailing address and PLC's principal place of business were in California when their petitions were filed.

II.  The Rowells

Mr. Rowell is a trial attorney who has practiced law in California for over 30 years.  His practice areas are personal injury and products liability.  He has received various awards and certificates of appreciation from several professional organizations.  He practiced law during the years in issue through PLC, his wholly owned corporation.

Mrs. Rowell is a television and screen writer.  During the years in issue she worked as a screenwriter and as a buyer and seller of vintage dolls and similar collectible items (collectively, vintage dolls).  She worked through Knutsen, her wholly owned corporation.

Each of the Rowells is well educated and devotes long hours to his or her profession.  Neither of the Rowells is proficient on the subject of tax law or on the requirements thereof.

III.  Mr. Rowell's Law Practice

A.  PLC

Mr. Rowell graduated from law school in 1977, and he began practicing law at a law firm specializing in products liability. He formed PLC on September 20, 1982.

In 1999 PLC joined the law firm of Cheong, Denove, Rowell, Antablin & Bennett (Cheong firm).  The Cheong firm's practice included products liability.  During the years in issue, PLC was a partner in the Cheong firm, and Mr. Rowell was PLC's sole shareholder.  While Mr. Rowell (through PLC) worked for the Cheong firm, he also (through PLC) worked on some cases for PLC alone.

For 1999 the Cheong firm issued PLC a Schedule K-1, Partner's Share of Income, Credits, Deductions, etc., reporting that PLC realized $92,120 of taxable income for 1999 with respect to its partnership interest in the Cheong firm.  PLC reported on its 1999 Federal income tax return that it realized $7,574 of taxable income as to that interest.

B.  Advanced Client Costs

When Mr. Rowell (through the firm for which he worked) retained a client, the retainer agreement stated that the firm would pay certain litigation costs (e.g., costs of depositions, transcripts, and filing fees) for the client and that the firm would recover its payment of those costs (advanced client costs)

from any proceeds received at the end of the client's case. Mr. Rowell (through his firm) represented plaintiffs in lawsuits that involved significant amounts of advanced client costs. PLC did not always recover the full amount of advanced client costs paid on behalf of a client. PLC recorded its payment of a client's advanced client costs as a loan to that client.

IV. <u>Knutsen</u>

A. <u>Background</u>

Mrs. Rowell organized Knutsen on September 2, 1982. Mrs. Rowell was Knutsen's only employee. Initially, Knutsen's sole business was the leasing of Mrs. Rowell's writing services.

B. <u>Knutsen's Doll Business</u>

In 2001 Mrs. Rowell's earning capacity as a writer began to decline, and Mrs. Rowell decided to expand Knutsen's business to include the purchase and sale of vintage dolls. During 2001 and 2002 Knutsen bought and sold vintage dolls through an eBay store. Knutsen initially bought and sold collectible Barbie dolls but later expanded into other collectible items. During 2001 and 2002 Knutsen generally maintained a daily inventory of 900 to 1,000 vintage dolls. Knutsen attempted to sell each of its vintage dolls above cost but was not always able to do so.

C. <u>2001 and 2002 Expenses</u>

During 2001 and 2002 Knutsen paid its business expenses (including inventory purchases) primarily by check or credit

card.  During those respective years Knutsen paid $157,258 and $29,661 for vintage dolls it purchased for resale.  Knutsen also paid the following expenses:

|  | 2001 | 2002 |
|---|---|---|
| Listing fees | $4,678 | $3,172 |
| Outside services | 5,984 | 2,885 |
| Rent | 2,234 | 4,533 |
| Research | 13,812 | 13,390 |
| Shared residuals | 293 | 1,443 |
| Dues | -0- | 3,608 |
| Postage | 102 | 123 |
| Supplies | 301 | 100 |
| Telephone | 375 | 203 |
| Bank service fees | 57 | 20 |
| Utilities | 73 | 136 |
| Computer maintenance | -0- | 276 |
| Accounting | 720 | -0- |
| Taxes | 1,600 | -0- |
| Total | 30,229 | 29,889 |

The listing fees expense related to Knutsen's doll business, and the research, dues, and shared residuals expenses related to Knutsen's screenwriting business.  All of the remaining expenses related to both businesses.

D.  2001 and 2002 Income

During 2001 and 2002 Knutsen deposited into its operating accounts the following amounts related to its doll and screenwriting businesses:

| Year | Doll Business | Screenwriting Business | Total |
|---|---|---|---|
| 2001 | $18,055 | $174,622 | $192,677 |
| 2002 | 23,602 | 18,339 | 41,941 |

V. Petitioners' Financial Records

The Rowells maintained petitioners' financial records using Quicken, a computerized accounting system.  Each of the Rowells (sometimes with the help of others) entered petitioners' financial information into Quicken's database.  This information related to checks, expenses, transfers, deposits, and payees. Petitioners' expenses would be input into various categories of the database that reflected the character of the expenditures. Petitioners used a "split" function in Quicken to apportion the amount of an expenditure into various categories of expenses and to account for that expenditure by the various categories. Petitioners generally did not maintain supporting documents for entries input into the database.

VI. Petitioners' Financial Accounts

A. The Rowells

The Rowells maintained various personal checking accounts. The Rowells also maintained a personal equity line of credit account and various personal brokerage accounts.

B. PLC

PLC maintained various bank accounts for its operation (collectively, PLC operating accounts).  PLC also maintained various client trust accounts.  During the years in issue each of the Rowells authorized disbursements out of the PLC operating accounts.

C. <u>Knutsen</u>

Knutsen maintained various bank accounts for its operation (collectively, Knutsen operating accounts).  Knutsen also maintained a brokerage account.  During the years in issue each of the Rowells authorized disbursements out of the Knutsen operating accounts.

D. <u>Credit Card Accounts</u>

The Rowells had many credit card accounts.  Neither PLC nor Knutsen had any credit card account in its name.

VII. <u>The Rowells' Intermingling Personal and Corporate Funds</u>

A. <u>The Rowells' Personal Use of PLC Funds</u>

During 2000, 2001, and 2002 the Rowells took funds from PLC's operating accounts for their personal use.  The Rowells took those funds through checks, withdrawals, and transfers, and they used those funds to pay their living expenses (including the expenses of their children) or otherwise spent them at their discretion.  With one exception, none of the transactions underlying the taking or the use of those funds related to PLC's business, and the Rowells did not report any of those funds as a distribution (or other type of income).[4]  The amounts of those funds were $427,870 in 2000, $272,862 in 2001, and $92,631 in 2002.

---

[4]The single exception is that the Rowells reported $109,000 of those funds as wages that PLC paid Mr. Rowell in 2000.

Mr. Rowell transferred $28,000 to PLC during 2000, and he caused another $20,000 to be deposited during that year into the PLC operating accounts.  Mr. Rowell transferred $48,500 to PLC during 2001.

B.  The Rowells' Personal Use of Knutsen Funds

During 2001 and 2002 the Rowells took funds from Knutsen's operating accounts for their personal use.  The Rowells took those funds through checks, withdrawals, and transfers, and they used those funds to pay their living expenses (including the expenses of their children) or otherwise spent them at their discretion.  None of the transactions underlying the taking or the use of those funds related to Knutsen's business, and the Rowells did not report any of those funds as a distribution (or other type of income).  The amounts of those funds were $222,871 in 2001 and $97,675 in 2002.

The Rowells transferred $69,030 and $58,675 to Knutsen during 2001 and 2002, respectively.

C.  The Rowells' Payment of Corporate Expenses With Credit Cards

The Rowells routinely used their personal credit cards to pay the business expenses of the subject corporations.

VIII.  Petitioners' Tax Returns

A.  Overview

Edward Cutter (Mr. Cutter) prepared all of the Federal income tax returns at issue.  Mr. Cutter is a certified public accountant who was the Rowells' longtime tax return preparer.  He prepared the subject returns following his regular practice whereby Mr. Rowell brought in petitioners' data, Mr. Cutter input the data into his tax preparation system, Mr. Cutter and Mr. Rowell discussed the data superficially, and Mr. Cutter printed the returns (and possibly in some cases reprinted a return after correcting a mistake that Mr. Rowell identified on the return).

With respect to each of the Rowells' Federal income tax returns at issue, Mr. Cutter spent a total of approximately 1 hour preparing that return and the related State income tax return for the year.  With respect to each of the subject corporations' Federal income tax returns at issue, Mr. Cutter spent a total of approximately 1 hour preparing that return.  Mr. Cutter prepares a lot of tax returns each tax season, and he tries not to get involved with a client's financial situation or to offer a client advice on the particulars of tax law.  Mr. Cutter did not help (nor did he want to help) the Rowells ascertain petitioners' data for their tax returns, or explain to them the requirements for any particular deduction.  When he prepared each of the tax returns for the subject corporations,

Mr. Cutter checked the return to make sure it was consistent with the prior year's return, and he checked to make sure the balance sheet balanced.

PLC's 1999 through 2002 returns reported that at the end of those respective years PLC owed Mr. Rowell $428,234, $513,801, $561,674, and $574,862 in loans.[5] Knutsen's 2001 and 2002 returns reported at the end of those respective years that Knutsen owed Mrs. Rowell $44,000 and $31,162 in loans. There were no written agreements or promissory notes evidencing any of the amounts reported as loans to or by PLC or Knutsen, and neither Mr. Rowell nor Mrs. Rowell charged interest on any amount that was lent to his or her separate corporation. None of the amounts reported as loans were collateralized, and none of those amounts were repayable pursuant to a schedule or any other specific term. The Rowells and the subject corporations did not record the amount of any loan between them or otherwise keep track of it accurately.

B. PLC's Returns

PLC's 1999 through 2002 Federal income tax returns reported total income and claimed total deductions in the following amounts:

---

[5]PLC's 1999 return reported $280,234 of loans from Mr. Rowell at the beginning of the year.

| Year | Total Income Reported | Total Deductions Claimed |
|------|----------------------|--------------------------|
| 1999 | $355,560 | $355,896 |
| 2000 | 487,235 | 481,954 |
| 2001 | 107,941 | 108,105 |
| 2002 | 287,735 | 287,735 |

Mr. Rowell did not anticipate before these returns were prepared that PLC would owe any tax for 1999 through 2002. Such was so because PLC had limited cases and had just closed a case where it was unable to recover approximately $200,000 in advanced client costs.

C. Knutsen's Returns

Knutsen's 2001 and 2002 Federal income tax returns reported total income and claimed total deductions in the following amounts:

| Year | Total Income Reported | Total Deductions Claimed |
|------|----------------------|--------------------------|
| 2001 | $53,679 | $53,800 |
| 2002 | 69,084 | 68,514 |

The Rowells did not anticipate before these returns were prepared that Knutsen would owe any tax for 2001 or 2002. Such was so because Knutsen had purchased what the Rowells considered to be a significant amount of inventory in 2001.

IX. Audit of the Subject Tax Returns

A. Overview

Respondent audited petitioners' Federal income tax returns that are the subject of the notices of deficiency (subject tax returns). Respondent also included the Rowells' 1999 tax return

in the audit.  Respondent started auditing PLC on February 6, 2003, and expanded the audit on October 23, 2003, to include the Rowells.  Respondent further expanded the audit on June 29, 2004, to include Knutsen.

Initially, Mr. Cutter was petitioners' representative in the audit, and Mr. Rowell gave Mr. Cutter documents to give to respondent's revenue agent (agent).  Mr. Rowell eventually met repeatedly with the agent, and he personally produced many documents to the agent and answered many questions.  The agent also interviewed Mrs. Rowell.

B.  PLC

PLC's records for 1999 through 2002 were incomplete and conflicting and did not reconcile to its tax returns.  Respondent ascertained PLC's gross receipts for 1999 through 2002 using a bank deposits analysis that included a review of deposits, canceled checks, and transfers into and out of PLC's operating accounts.  PLC's gross receipts for 1999 through 2002 as reported by PLC and as ascertained by respondent through the bank deposits analysis are as follows:[6]

---

[6]In addition to unreported gross receipts determined through the bank deposits analysis, respondent determined that PLC failed to report income from the Cheong firm of $84,546 ($92,120 - $7,574 = $84,546) and failed to report interest income of $197 and $1,196 for 2000 and 2002, respectively.  Petitioners concede these other adjustments.

| Year | Per Examination | Per Return | Difference |
|------|-----------------|------------|------------|
| 1999 | $833,080 | $649,033 | $184,047 |
| 2000 | [1]166,763 | 115,111 | 51,652 |
| 2001 | [2]99,090 | 39,058 | 60,032 |
| 2002 | 31,389 | 26,640 | 4,749 |

[1]Includes $8,220 of legal fees realized by PLC but deposited into the Rowells' personal bank accounts.

[2]Includes $27,073 that respondent determined was taxable income that Mr. Rowell won in a chess tournament on behalf of PLC but which was deposited into the Rowells' personal bank accounts.

Respondent allowed PLC certain deductions for each year. Two deductions were for advanced client costs and bad debts with respect to advanced client costs. Respondent allowed PLC to deduct advanced client costs to the extent that its clients' cases were settled and the clients' reimbursements of the advanced client costs were included in PLC's reconstructed gross receipts. Respondent allowed PLC to deduct a bad debt with respect to advanced client costs to the extent that PLC could not recover advanced client costs because its clients' cases were concluded without available funds to reimburse the advanced client costs. The amounts of these allowed deductions are as follows:

| Year | Advanced Client Costs | Bad Debt | Total |
|------|-----------------------|----------|-------|
| 1999 | $338,639 | $75,286 | $413,925 |
| 2000 | 17,996 | 72,999 | 90,995 |
| 2001 | 5,063 | 49,199 | 54,262 |
| 2002 | 37 | 21,381 | 21,418 |

Respondent determined that PLC owed Mr. Rowell $45,192 in loans at the end of 1999.  Respondent determined that PLC had no loans payable to Mr. Rowell at the end of 2000, 2001, or 2002.

C.  Knutsen

Knutsen's records for 2001 and 2002 were incomplete and conflicting and did not reconcile to its tax returns.  Respondent determined Knutsen's gross receipts for 2001 and 2002 using a bank deposits analysis that included a review of deposits, canceled checks, and transfers in and out of Knutsen's operating accounts.  Knutsen's gross receipts for 2001 and 2002 as reported by Knutsen and as initially determined by respondent through the bank deposits analysis are as follows:

| Year | Per Examination[1] | Per Return | Difference |
|------|-------------------|------------|------------|
| 2001 | $181,466 | $219,859 | $38,393 |
| 2002 | 20,472 | 83,184 | 62,712 |

[1]Respondent concluded that Knutsen's receipts from doll sales were Mrs. Rowell's personal proceeds and omitted those proceeds from these amounts.

Respondent later determined that some of Knutsen's gross receipts were not deposited into the Knutsen operating accounts and superseded his initial computation of Knutsen's gross receipts as follows:[7]

_____

[7]This superseding computation also includes Knutsen's receipts from doll sales.

| Year | Per Examination | Per Return | Difference |
|------|-----------------|------------|------------|
| 2001 | $219,859 | $219,859 | -0- |
| 2002 | 83,184 | 83,184 | -0- |

Respondent disallowed all of Knutsen's reported deductions and costs of goods sold for 2001 and 2002 except for $2,681 and $4,063 of deductions that Knutsen claimed for the respective years as "other deductions".  The amounts of these disallowed items are as follows:

| Expense Item | 2001 | 2002 |
|--------------|------|------|
| Cost of goods sold | $166,241 | $14,100 |
| Repairs and maintenance | 13,272 | -0- |
| Rents | 5,400 | 4,533 |
| Taxes and licenses | 1,488 | 80 |
| Advertising | 375 | 1,833 |
| Other deductions | 30,584 | 58,005 |

Respondent determined that Knutsen had no loans payable to Mrs. Rowell at the end of 2001 or 2002.

D.  The Rowells

1.  Overview

The Rowells' records for 2000 through 2002 were incomplete and conflicting and did not reconcile to their tax returns. Respondent determined the Rowells' income for 2000 through 2002 primarily on the basis of the bank deposits analyses of the subject corporations.  Respondent also reviewed deposits, canceled checks, and transfers into and out of the Rowells' personal bank accounts.

### 2. Distributions From PLC

As stated supra pp. 10-11, the Rowells took PLC funds for their personal use, and the amounts of these funds were $427,870 in 2000, $272,862 in 2001, and $92,631 in 2002. Of these amounts, respondent determined that the Rowells had received constructive distributions of $225,678 for 2000, $224,362 for 2001, and $92,487 for 2002. Respondent determined the amounts of these constructive distributions after taking into account the $45,192 in loans that PLC owed Mr. Rowell as of January 1, 2000, the $109,000 of wages that the Rowells reported Mr. Rowell received from PLC in 2000, the $96,500 that Mr. Rowell transferred to PLC, and a $144 credit.

With respect to the constructive distributions that he determined Mr. Rowell received from PLC during 2000 through 2002, respondent determined, first, that PLC's current and accumulated earnings and profits (E & P) for 2000, 2001, and 2002 were such that $225,678, $124,967, and $92,487 of the distributions in the respective years were dividends. Second, because the distribution for 2001 exceeded PLC's current and accumulated E & P (as determined by respondent), respondent determined that $1,000 of that distribution was a nontaxable return of capital and the remainder, $98,395, a taxable capital gain. In sum, respondent characterized Mr. Rowells' constructive distributions from PLC as follows:

| Year | Distributions | Dividends | Return of Capital | Capital Gain |
|------|--------------|-----------|-------------------|--------------|
| 2000 | $225,678 | $225,678 | -0- | -0- |
| 2001 | 224,362 | 124,967 | $1,000 | $98,395 |
| 2002 | 92,487 | 92,487 | -0- | -0- |

### 3. Distributions From Knutsen

As stated supra p. 11, the Rowells took Knutsen funds for their personal use, and the amounts of these funds were $222,871 in 2001 and $97,675 in 2002. Of those amounts, respondent determined that the Rowells had received constructive distributions of $163,425 for 2001 and $35,752 for 2002.[8] Respondent determined the amounts of these constructive distributions after taking into account the $127,705 that the Rowells transferred to Knutsen and the $41,657 of doll sales income (which respondent determined was realized by Mrs. Rowell) deposited into the Knutsen operating accounts.[9]

Respondent characterized the constructive distributions that he determined Mrs. Rowell received from Knutsen during 2001 and 2002. First, respondent determined that Knutsen's current and

---

[8]Respondent determined that during 2001 and 2002 the Rowells respectively took $250,511 and $118,029 of Knutsen funds for their personal use and that the respective constructive distributions were $163,425 and $35,752. We find that $27,640 and $20,354 of the respective amounts for 2001 and 2002 were spent in Knutsen's doll business and do not include those amounts in the amounts that the Rowells took for their personal use. Consequently, the constructive distributions are reduced to $135,785 for 2001 and $15,398 for 2002.

[9]A $1 discrepancy is attributable to rounding.

accumulated E & P for those years were such that $163,425 and $31,258 of the distributions in the respective years were characterized as dividends.  Second, in that the distribution for 2002 exceeded Knutsen's current and accumulated E & P for that year (as determined by respondent), respondent determined that $1,000 of that distribution was a nontaxable return of capital and the remainder, $3,494, a taxable capital gain.  In sum, respondent characterized Mrs. Rowells' constructive distributions from Knutsen as follows:

| Year | Distributions | Dividends | Return of Capital | Capital Gain |
|------|--------------|-----------|-------------------|--------------|
| 2001 | $163,425 | $163,425 | -0- | -0- |
| 2002 | 35,752 | 31,258 | $1,000 | $3,494 |

### 4.  Summary of Distributions

Respondent determined that the characterization of constructive distributions received by the Rowells was as follows:

| Year | Distributions | Dividends | Return of Capital | Capital Gain |
|------|--------------|-----------|-------------------|--------------|
| 2000 | $225,678 | $225,678 | -0- | -0- |
| 2001 | 387,788 | 288,393 | $1,000 | $98,395 |
| 2002 | 128,239 | 123,745 | 1,000 | 3,494 |

### 5.  NOL Deduction for 2002

The Rowells reported on their 2000 Federal income tax return that they were entitled to deduct a net operating loss (NOL) carryover of $31,996.  The 2000 return provides no explanation of

the computation or genesis of the claimed NOL carryover. Respondent disallowed this deduction.

## X.  $100,000 Wire Transfer

In 2001 Mr. Rowell and a fellow businessman, Phil Weber (Mr. Weber), began discussing a possible joint investment in a charter school to be formed by Mr. Weber and another individual. Mr. Weber worked hard on the project during 2002, and he aspired to form the school.

On December 31, 2002, as part of the joint investment, Mr. Rowell caused $100,000 to be transferred from a PLC operating account to the bank account of Sandra Raposa (Ms. Raposa). Ms. Raposa was the domestic partner of Mr. Weber, and she (at the request of Mr. Weber) accepted the $100,000 transfer on his behalf. Mr. Weber used Ms. Raposa's account because he did not have a bank account at the time. Mr. Rowell caused the $100,000 to be transferred so late in 2000 because Mr. Rowell anticipated claiming for that year a tax deduction (or a tax credit) as to the payment. As of that time, Messrs. Rowell and Weber did not have a set investment plan.

On January 2, 2003, Ms. Raposa transferred $88,500 of the $100,000 to a personal account of the Rowells. She did so because Messrs. Rowell and Weber did not yet have a set investment plan and Mr. Weber did not want to keep the funds in Ms. Raposa's account without such a plan. Mr. Rowell used the

$88,500 to pay down a loan he had received in his individual capacity. Mr. Weber retained the remaining $11,500 as a payment due him for previous business dealings with Mr. Rowell. Respondent asserts in the amendment to answer in docket No. 27629-07 that the $100,000 is a constructive dividend that the Rowells failed to include in their income for 2002.

The charter school project fell through in April or May of 2003 when the individual whom Mr. Weber had been dealing with opted out of the project.

XI.  The Rowells' Additional Income Reported on Amended California Returns

On December 21, 2005, Mr. Rowell retained an enrolled agent, Donald Cormier, Sr. (Mr. Cormier), to replace Mr. Cutter as petitioners' representative in the audit because Mr. Rowell was no longer comfortable with Mr. Cutter's representation of petitioners' interests. Mr. Cormier met with the agent, and he gave the agent information the agent requested. On October 2, 2006, the agent gave Mr. Cormier respondent's proposed reports for the Rowells' 2000, 2001, and 2002 taxable years, and the agent discussed those proposed reports with Mr. Cormier. Mr. Cormier then discussed the proposed reports with Mr. Rowell.

 Mr. Rowell anticipated that respondent's audit would cause the State of California to audit petitioners' 2000 through 2002 State income tax returns, and he thought that the Rowells would not have to pay the State of California any penalty for those

years if he voluntarily informed the State that the Rowells had realized more income than they had previously reported to the State. On December 29, 2006, the Rowells filed amended California income tax returns to report additional income of $789,287, $572,181, and $349,915 for 2000, 2001, and 2002, respectively. The amended California returns reflected the following information:

| Year | AGI Originally Reported | State Tax Originally Reported | AGI on Amended California Returns | State Tax on Amended California Returns |
|------|------|------|------|------|
| 2000 | $77,950 | $291 | $867,237 | $75,204 |
| 2001 | 26,110 | -0- | 598,291 | 50,067 |
| 2002 | 12,243 | -0- | 362,249 | 25,327 |

Mr. Cormier's accounting firm prepared the amended California returns on the basis of the amounts of additional income that Mr. Rowell told Mr. Cormier to report. Mr. Rowell set the amounts of that income to generate a State tax liability that represented a portion of the Federal income tax adjustment proposed by respondent. The amended California returns stated that the Rowells had become aware of additional income not reported on their State returns but did not disclose that petitioners' Federal income tax returns for the related years were under audit by the Internal Revenue Service. The Rowells paid the State income tax liabilities reported on the amended California returns. The Rowells did not tell the agent that they filed the amended California returns.

The Rowells did not amend any of their Federal income tax returns for 2000 through 2002.

## XII. Notices of Deficiency

On August 31, 2007, respondent mailed petitioners the notices of deficiency in issue.

OPINION

## I. Burden of Proof

### A. Deficiencies Listed in the Notices of Deficiency

The Commissioner's determinations of deficiencies in tax (as listed in a notice of deficiency) generally are presumed correct, and the taxpayer bears the burden of proving those determinations wrong. See Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933); Durando v. United States, 70 F.3d 548, 550 (9th Cir. 1995). The Court of Appeals for the Ninth Circuit, to which an appeal of these cases would lie, has held that the presumption of correctness attaches to a notice of deficiency in unreported income cases only when the Commissioner establishes a minimal evidentiary foundation demonstrating that the taxpayer received unreported income. See Palmer v. U.S. IRS, 116 F.3d 1309, 1312-1313 (9th Cir. 1997); Edwards v. Commissioner, 680 F.2d 1268, 1270 (9th Cir. 1982). Once such a foundation is established, as it is here, the burden shifts to the taxpayer to prove the portion of the unreported income that is not taxable. See Hardy v. Commissioner, 181 F.3d 1002, 1004 (9th Cir. 1999), affg. T.C.

Memo. 1997-97; <u>Palmer v. U.S. IRS</u>, <u>supra</u> at 1312-1313.
Accordingly, petitioners bear the burden of proof as to the
deficiencies listed in the notices of deficiency.  This is true
as to both the unreported income and the disallowed deductions
underlying those deficiencies.[10]

B.   <u>Increased Deficiencies</u>

Respondent in an amendment to answer in docket No. 27629-07
asserts that the Rowells are liable for deficiencies in amounts
greater than the amounts listed in the corresponding notices of
deficiency.  Respondent bears the burden of proof as to these
increased deficiencies.  See Rule 142(a)(1).

C.   <u>Fraud</u>

Respondent determined (or asserts in his answer or an
amendment thereto) that petitioners are liable for fraud
penalties under section 6663.  Respondent must prove fraud by
clear and convincing evidence.  See sec. 7454(a); Rule 142(b);
<u>Rowlee v. Commissioner</u>, 80 T.C. 1111, 1123 (1983).

---

[10]While sec. 7491(a)(1) provides that the burden of proof
shifts to the Commissioner in certain cases, we conclude that
this is not one of those cases.  Petitioners have neither alleged
in their petitions nor asserted in their opening brief that sec.
7491(a) applies here.  Nor have petitioners established that they
have met the requirements of sec. 7491(a)(2)(A) and (B) to
substantiate items, to maintain required records, and to
cooperate fully with respondent's reasonable requests.  See
<u>Weaver v. Commissioner</u>, 121 T.C. 273, 275 (2003).

II.  Bank Deposits Analysis

    A.  Overview

Gross income includes all income from whatever source derived, see sec. 61(a), and taxpayers are required to keep books and records sufficient to establish their Federal income tax liabilities, see sec. 6001; see also sec. 1.6001-1(a), (b), (e), Income Tax Regs.  Where taxpayers fail to maintain adequate records to establish that liability, the Commissioner may reconstruct their income by any method that the Commissioner believes reflects income clearly.  See sec. 446(b); see also Palmer v. U.S. IRS, supra at 1312; Parks v. Commissioner, 94 T.C. 654, 658 (1990); Petzoldt v. Commissioner, 92 T.C. 661, 686-687 (1989).  The Commissioner's method need not be exact; however, it must be reasonable in light of the surrounding facts and circumstances.  See Holland v. United States, 348 U.S. 121 (1954); Petzoldt v. Commissioner, supra at 687; see also Cracchiola v. Commissioner, 643 F.2d 1383, 1384-1385 (9th Cir. 1981) (stating that the Commissioner's method of reconstructing income is reasonable if it is "rationally based"), affg. T.C. Memo. 1979-3.

Respondent reconstructed petitioners' income by using the bank deposits method.  The bank deposits method is an acceptable method for reconstructing income.  See Harper v. Commissioner, 54 T.C. 1121 (1970); see also United States v. Stone, 770 F.2d

842, 844 (9th Cir. 1985) (holding that the Commissioner may use the bank deposits method to establish a deficiency to support a conviction for attempted income tax evasion). Funds deposited in a taxpayer's bank accounts are presumed to be from a taxable source unless the taxpayer establishes they are from a nontaxable source (e.g., from gifts, loans, or transfers between bank accounts). See Clayton v. Commissioner, 102 T.C. 632, 645-646 (1994); see also Calhoun v. United States, 591 F.2d 1243, 1245 (9th Cir. 1978); Price v. United States, 335 F.2d 671, 677 (5th Cir. 1964).

B. Knutsen's Disputed Income

Respondent's initial bank deposits analysis of Knutsen's bank accounts showed that Knutsen's deposits for 2001 and 2002 were $38,393 and $62,712, respectively, less than the gross receipts reported on Knutsen's 2001 and 2002 Federal income tax returns. Petitioners argue that Knutsen may adjust its reported gross receipts to match the reduced amounts reflected in respondent's initial bank deposits analysis. We disagree. Petitioners cite no authority (nor are we aware of any authority) which allows a corporate taxpayer such as Knutsen to reduce its reported gross receipts to the amount of its deposits as ascertained through a bank deposits analysis without further proof that the lower amount is correct. Such is especially so where, as here, the record does not establish that Knutsen's

reported gross receipts reflected only the amounts that Knutsen deposited into its bank accounts and respondent's superseding bank deposits analysis reflected gross receipts that were not deposited into Knutsen's bank accounts. See United States v. Soulard, 730 F.2d 1292, 1296 n.1 (9th Cir. 1984) (explaining that a bank deposits analysis requires that amounts deposited into bank accounts be increased by income not deposited into the bank accounts (citing United States v. Hall, 650 F.2d 994, 996 n.4 (9th Cir. 1981))). We also note that respondent's initial analysis omitted $18,055 and $23,602 of gross receipts attributable to Knutsen's doll business on the belief that the doll business was Mrs. Rowell's business. We hold for respondent on this issue.

C. PLC's Disputed Income

Respondent's bank deposits analysis of PLC's accounts determined that PLC failed to report gross receipts of $184,047 for 1999, $51,652 for 2000, $60,032 for 2001, and $4,749 for 2002. Petitioners concede that respondent correctly determined PLC's deposits for each year but argue that respondent failed to characterize PLC's advanced client costs reimbursements as nontaxable income. Petitioners argue that those reimbursements are nontaxable pursuant to Herrick v. Commissioner, 63 T.C. 562 (1975), because they are akin to the repayment of a loan.

We disagree with petitioners' assertion that PLC is entitled to an adjustment with respect to respondent's treatment of its advanced client costs.  While respondent included the reimbursements in PLC's reconstructed gross receipts, respondent also allowed the related costs to be deducted.  Thus, if we were to accept petitioners' invitation now to exclude the reimbursements from income because they are akin to the repayment of loans, we would be compelled to deny the accompanying deductions because they are akin to the making of loans.  While petitioners are correct that advanced client costs are generally considered to be loans rather than expenses, and hence that the reimbursements of these costs are generally considered nontaxable income as are amounts received in repayment of loans, petitioners have offered no reason why respondent's treatment of these costs does not accomplish the same result in these cases.  Nor have petitioners persuaded us that any advanced client cost that was reflected in the reconstructed gross receipts was not deducted from their gross income.

Petitioners also identify nine deposits in respondent's bank deposits analysis that petitioners claim represent nontaxable income.  These deposits are in the amounts of $10,000, $5,000, $3,500, $5,000, $5,000, $10,000, $3,000, $15,000, and $30,000.  Petitioners state that these deposits "appear to be either shareholder loan repayments, interbank transfers or partnership

distributions" because PLC had "no likely source of income that would generate 'round' number deposits". Petitioners ask the Court to characterize these deposits as nontaxable income.

We decline to do so. As stated above, PLC's bank deposits are prima facie evidence of income, and all money deposited into PLC bank accounts is presumed to reflect taxable income unless petitioners establish otherwise. Petitioners have not submitted sufficient evidence to rebut this presumption. Petitioners' mere belief that the amounts "appear" to be from a nontaxable source and that PLC did not have a "likely source of income" that would be in "round" numbers is not sufficient to disprove respondent's determination under the bank deposits analysis.[11]

III. The Rowells' Disputed Income

A. Overview

Respondent adjusted the Rowells' income to reflect his determination that they received constructive distributions from the subject corporations. Respondent also adjusted the Rowells' income to reflect the disallowed NOL deduction. Respondent also adjusted the Rowells' income to reflect the amended California returns and the $100,000 transfer to Ms. Raposa's account. We address each adjustment in turn.

---

[11]Nor have petitioners established that a $7,773 deposit in 2000 represents nontaxable income. They have established, however, that a $23,980 deposit in 2001 is not taxable income in that it was a repayment of a loan to a client.

B.  Constructive Distributions

    1.  Overview

Respondent determined that the Rowells received constructive distributions from the subject corporations and that some of the distributions were taxable to the Rowells as constructive dividends while others were taxable to the Rowells as capital gains.  We agree with this determination for the most part.

    2.  Rules Applicable to Distributions

Under section 301, funds (or other property) distributed by a corporation to a shareholder with respect to its stock are taxable under section 301(c).  Under sections 301(c) and 316, a distribution is taxed to the distributee shareholder as a dividend to the extent of the distributor corporation's E & P. Any excess is considered to be a nontaxable return of capital to the extent of the shareholder's basis in the corporation, and any remaining amount is then taxable to the shareholder as a gain from the sale or exchange of property.  See sec. 301(c)(2) and (3); Truesdell v. Commissioner, 89 T.C. 1280, 1295-1298 (1987). Section 301 characterizes a distribution as a dividend regardless of whether the distribution is formally declared to be a dividend.  See Boulware v. United States, 552 U.S. 421, 429 (2008); Truesdell v. Commissioner, supra at 1295; see also Noble v. Commissioner, 368 F.2d 439, 442 (9th Cir. 1966), affg. T.C. Memo. 1965-84.

Corporate funds that a controlling shareholder diverts to personal use are generally characterized as constructive distributions to the shareholder for tax purposes. See Erickson v. Commissioner, 598 F.2d 525, 531 (9th Cir. 1979), affg. in part and revg. in part T.C. Memo. 1976-147; Strong v. Commissioner, T.C. Memo. 2005-125. Such a diversion may occur, for example, where a corporation makes a distribution to a controlling shareholder that serves no legitimate corporate purpose and the distribution results in an economic benefit to the shareholder. See Strong v. Commissioner, supra; see also Meridian Wood Prods. Co. v. United States, 725 F.2d 1183, 1191 (9th Cir. 1984). Such a diversion also may occur where a controlling shareholder causes a corporation to pay his or her personal expense and the payment primarily benefits the shareholder and is made without expectation of repayment or without a bona fide intent that it be in repayment of a shareholder loan. See Hood v. Commissioner, 115 T.C. 172, 179-180 (2000); see also Noble v. Commissioner, supra at 443; Clark v. Commissioner, 266 F.2d 698, 710-711 (9th Cir. 1959), affg. in part, revg. in part and remanding T.C. Memo. 1957-129.

The subject corporations' payments of the Rowells' personal expenses primarily benefited the Rowells, and the payments had no

connection with the subject corporations' businesses.[12]
Petitioners claim that the distributions were either repayments
of shareholder loans or the making of shareholder loans and
therefore that the distributions were erroneously characterized
as distributions.  We carefully scrutinize this claim and give
greater weight to the objective indicia of debt than to
petitioners' self-serving statements of intent.  See Turner v.
Commissioner, 812 F.2d 650, 654 (11th Cir. 1987), affg. T.C.
Memo. 1985-159; Berry Petroleum Co. & Subs. v. Commissioner, 104
T.C. 584, 642 (1995), affd. without published opinion 142 F.3d
442 (9th Cir. 1998).  The critical question is whether the
Rowells and the subject corporations intended at the time of the
distributions to create a bona fide debtor/creditor relationship.
See Estate of Chism v. Commissioner, 322 F.2d 956, 960 (9th Cir.
1963), affg. Chism Ice Cream Co. v. Commissioner, T.C. Memo.
1962-6.  Factors to consider in answering this question include:
(1) Whether the promise to repay is evidenced by a note or other
instrument; (2) whether interest was charged; (3) whether a fixed
schedule for repayment was established; (4) whether collateral
was given to secure payment; (5) whether repayments were made;
(6) whether the borrower had a reasonable prospect of repaying
the loan and whether the lender had sufficient funds to advance

---

[12]Payees included, for example, the Rowells' housekeeper, gardener, grocers, tailor, hair stylist, insurer, pool cleaner, utility providers, and medical care providers.

the loan; and (7) whether the parties conducted themselves as if the transaction was a loan.  See Welch v. Commissioner, 204 F.3d 1228, 1230 (9th Cir. 2000), affg. T.C. Memo. 1998-121; see also Commissioner v. Valley Morris Plan, 305 F.2d 610, 618 (9th Cir. 1962) (defining a "loan" for Federal tax purposes as "'an agreement, either expressed or implied, whereby one person advances money to the other and the other agrees to repay it upon such terms as to time and rate of interest, or without interest, as the parties may agree'" (quoting Natl. Bank of Paulding v. Fidelity & Cas. Co., 131 F. Supp. 121, 123-124 (S.D. Ohio 1954)), revg. 33 T.C. 572 (1959) and Morris Plan Co. v. Commissioner, 33 T.C. 720 (1960).  We are mindful that formalities are not always followed where, as here, the setting involves shareholders and their closely held corporations.  See, e.g., Teymourian v. Commissioner, T.C. Memo. 2005-232.

We reject petitioners' claim as unsupported by the record. The record does not establish that the subject corporations and the Rowells intended at the time of any distribution that the distribution be an actual repayment of a loan to a shareholder or the actual making of a loan to a shareholder.  Nor does the record establish that the Rowells and the subject corporations conducted themselves as if the distributed amounts were loans or repayments of loans.  The purported shareholder loans were not evidenced by notes or other writings, they were not secured by

collateral, they did not require the payment of interest, and they were not subject to repayment schedules or to any specific terms of repayment. The Rowells and the subject corporations did not record the amount of any loan between them or otherwise keep track of it accurately. The distributed amounts were not contemporaneously designated as the proceeds of a loan or the repayment of a loan. Petitioners also have not persuaded us that there was any outstanding loan at the time of any distribution (other than those loans that were reflected in the payments for which respondent gave the Rowells credit in arriving at the amounts of the distributions),[13] or that the Rowells reimbursed the subject corporations any of the funds reflected in the distributions. Nor have they persuaded us that either the Rowells or the subject corporations had sufficient funds either to make loans of that magnitude or to repay loans of that magnitude. In fact, it appears from the record that the subject corporations' repayment to the Rowells of any loan of that

_____

[13]While PLC reported significant amounts of outstanding shareholder loans at the end of 2000, 2001, and 2002 and Knutsen reported significant amounts of outstanding loans at the end of 2001 and 2002, respondent determined that neither subject corporation had any outstanding shareholder loan as of those dates. Petitioners have failed to prove that determination wrong. We note in this regard that petitioners have effectively conceded that the subject corporations substantially overstated the amounts of the shareholder loans reported on the returns in issue and have introduced no credible evidence that allows the Court to find amounts that are different from those respondent determined.

magnitude would not be assured with any reasonable likelihood but would be subject to the risk of the success of the subject corporations' businesses. Cf. Estate of Mixon v. United States, 464 F.2d 394, 402 (5th Cir. 1972) (factor to consider in deciding whether a payment reflects debt or equity). In sum, petitioners have failed to establish that the requisite bona fide debtor/creditor relationship existed between the Rowells and the subject corporations at the time of any of these distributions, and such is so notwithstanding our recognition that shareholders and their closely held corporations may sometimes be lax in formalizing their dealings with each other.[14] We sustain respondent's determinations set forth in the notices of deficiency as to the total amounts of the constructive distributions (subject to our adjustment discussed supra note 8).

### 3. E & P

As discussed supra, the constructive distributions to the Rowells are deemed to be dividends to them to the extent of each distributor's E & P. Respondent determined each corporation's

---

[14]We have no doubt that a shareholder and his or her closely held corporation can enter into regular loans with each other or can enter into an agreement whereby the corporation pays for all of the shareholder's personal expenses and the amounts of those payments are considered to be loans between the two. We believe, however, that such an agreement must be accompanied by reliable outward manifestations of debt, given the close relationship between the shareholder and the corporation and the risk of abuse, and we do not find that the distributions at hand have sufficient manifestations or specificity of debt other than as established through the bald assertions of Mr. Rowell.

E & P, and that determination is presumed to be correct.  See
<u>DiLeo v. Commissioner</u>, 96 T.C. 858, 884 (1991), affd. 959 F.2d 16
(2d Cir. 1992); see also Rule 142(a)(1).  Petitioners set forth
no specific argument in response to respondent's determinations
of each corporation's E & P, and petitioners have failed to
disprove those determinations.  We sustain them, subject to any
adjustment to E & P that results from this opinion.[15]

### 4. Characterization of Constructive Distributions

Respondent's application of the rules of section 301(c) to
the constructive distributions received by the Rowells is set
forth in our findings of fact.  We have reviewed those
computations, and we sustain them subject to any adjustment that
must be made in accordance with this opinion.

### C. NOL Deduction

The Rowells claimed on their Federal income tax return for
2000 that they were entitled to deduct an NOL of $31,996.
Respondent determined that the Rowells were not entitled to this
deduction.  We agree.

Section 172 allows a taxpayer to deduct an NOL for a taxable
year.  The amount of the NOL deduction equals the sum of the NOL
carryovers plus NOL carrybacks to that year.  See sec. 172(a).
Absent an election to the contrary, an NOL for a taxable year

---

[15]Petitioners also do not dispute respondent's determination
that each of the Rowells had a $1,000 basis in the stock of his
or her corporation.  We sustain that determination as well.

must first be carried back 2 years and then may be carried forward up to 20 years.  See sec. 172(b)(1)(A), (2), (3). Petitioners bear the burden of establishing both the existence of the NOL and the amount of any NOL that may be carried over to 2000.  See Rule 142(a)(1); United States v. Olympic Radio & Television, Inc., 349 U.S. 232, 235 (1955); Keith v. Commissioner, 115 T.C. 605, 621 (2000).  Such a deduction is a matter of legislative grace; it is not a matter of right.  See United States v. Olympic Radio & Television, Inc., supra at 235; Deputy v. du Pont, 308 U.S. 488, 493 (1940).

The Rowells admit that they lack any documentation to support their NOL deduction claimed for 2002 and have failed to establish that they otherwise are entitled to any of that claimed NOL deduction.  We sustain respondent's determination that the Rowells are not entitled to the claimed NOL deduction.

D.  Amended California Returns and Transfers

Through an amendment to answer, respondent asserts that petitioners failed to report "other earned income" of $789,287, $572,181, and $349,915 for 2000, 2001, and 2002, respectively, and additional dividend income of $100,000 for 2002.  The first three amounts, respondent asserts, result from the Rowells' filing of the amended California returns reporting income in amounts greater than the amounts reported for Federal income tax

purposes.  The $100,000 dividend, respondent asserts, results from the $100,000 transfer to Ms. Raposa.

Respondent argues that the Rowells' filing of the amended California returns means that they underreported their Federal income by like amounts.  Respondent relies primarily upon the case of Badaracco v. Commissioner, 464 U.S. 386 (1984), to support his result.  Respondent's reliance upon that case is misplaced.  There, the Court noted that the filing with the Commissioner of an amended Federal tax return reporting income not reported on the initial Federal return may be an admission of unreported income for Federal income tax purposes.  See id. at 399.  Here, Mr. Rowell testified credibly at trial that he filed the amended California returns on the basis of a hypothetical amount of income that would present a "worst case" scenario on any liability that the Rowells could owe the State of California, with an eye towards escaping the imposition of any penalties at the State level.  As respondent sees it, the Rowells voluntarily reported to the State of California significantly more taxable income than respondent determined through his extremely long, arduous, and detailed audit of petitioners' Federal income tax returns.  We reject respondent's claim that the Rowells had additional income on account of the amended California returns. On the record before us we do not deem the protective State returns determinative of the Federal income tax liabilities.

As to the additional income from the $100,000 transfer, we generally agree with respondent on this point. Gross income includes all accessions to wealth over which a taxpayer has complete dominion, see James v. United States, 366 U.S. 213, 219 (1961); Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955), and a taxpayer has dominion and control over cash when he has the freedom to use it at will, see Rutkin v. United States, 343 U.S. 130, 137 (1952). Mr. Rowell exercised his dominion and control over the $100,000 when he caused PLC to transfer that money to Ms. Raposa in connection with an investment contemplated by Mr. Rowell. While petitioners invite the Court to treat this distribution as occurring in 2003, i.e., the year in which $88,500 of that amount was transferred to their personal account, we decline to do so. The $100,000 was transferred from PLC's account in 2002 for the personal benefit of Mr. Rowell. That is the year in which it is taxable. See Ianniello v. Commissioner, 98 T.C. 165 (1992).[16]

IV. Knutsen's Disputed Deductions and Expenses

Respondent disallowed all of Knutsen's reported deductions for 2001 and 2002, except for $2,681 and $4,063 of deductions that Knutsen claimed for the respective years as "other

_____

[16]Of course, the treatment of the $100,000 must take account of sec. 301(c). We leave it to the parties to compute the portion of the $100,000 that is taxable as a dividend and the portion that is taxable as a capital gain.

deductions". Petitioners argue that they may deduct some or all of the disallowed amounts because Knutsen engaged in the doll business for profit, and petitioners substantiated Knutsen's entitlement to the disallowed amounts through documentation and the testimony of Mrs. Rowell. We agree in part.

The parties spend undue time disputing the applicability of section 183 to Knutsen's doll business and, more specifically, whether Knutsen had the profit motive described in that section so as not to preclude Knutsen from deducting certain amounts attributable to its doll business. The parties' reliance upon section 183 is misplaced. Section 183 does not apply where, as here, the taxpayer (Knutsen) is a C corporation. See sec. 183(a) (stating that deductions may be limited by section 183 when "an activity engaged in by an individual or an S corporation * * * is not engaged in for profit"); sec. 1.183-1(a), Income Tax Regs. (stating that no inference may be drawn from section 183 and its regulations as to whether a C corporation is engaged in an activity for profit); see also Misko v. Commissioner, T.C. Memo. 2005-166 (stating that section 183 does not apply to C corporations).[17]

---

[17]Respondent also argues that the Rowells, rather than Knutsen, conducted the doll business. The facts at hand establish to the contrary, e.g., that Knutsen (as opposed to the Rowells) realized revenue from the doll business and paid the expenses of that business.

As otherwise framed by the parties, our resolution of this issue turns on whether Knutsen substantiated the amounts that it claimed as deductions. Mrs. Rowell explained at trial the manner in which Knutsen paid its business expenses, and the record includes documentary evidence supporting Knutsen's claim that it purchased dolls and paid operating expenses during 2001 and 2002. We list in our findings of fact the expenses and costs of goods sold that Knutsen claimed for 2001 and 2002. We conclude that Knutsen is entitled to those items with two exceptions. First, petitioners concede that one-half of the amount of the research expenses was paid for the personal expenses of the Rowells. Knutsen may not deduct those personal expenses of $6,906 for 2001 and $6,695 for 2002. Second, petitioners concede that Knutsen's cost of goods sold deductions for 2001 and 2002 are limited to the amounts of its doll sales in those respective years. Thus, pursuant to petitioners' concession, Knutsen's costs of goods sold for 2001 and 2002 are capped at $18,055 and $23,602, respectively.

V. Petitioners' Liability for Fraud

A. Overview

We decide whether any of petitioners is liable for a fraud penalty under section 6663.[18] Respondent determined (or asserts

---

[18] In relevant part, sec. 6663 provides:

(continued...)

in his answer or an amendment thereto) that each petitioner is liable for fraud penalties under section 6663. Section 6663(a) imposes a penalty of 75 percent of the portion of an underpayment that is attributable to fraud. In order to establish fraud, respondent must prove by clear and convincing evidence that: (1) Petitioners underpaid their Federal income taxes, and (2) some part of each underpayment was due to fraud. See Powell v. Granquist, 252 F.2d 56 (9th Cir. 1958); Parks v. Commissioner, 94 T.C. 654, 660-661 (1990); Miller v. Commissioner, 94 T.C. 316, 332 (1990). If respondent meets this burden, we consider all of the underpayments to be attributable to fraud unless petitioners establish otherwise by a preponderance of the evidence. See sec. 6663(b).

---

[18](...continued)
SEC. 6663. IMPOSITION OF FRAUD PENALTY.

(a) Imposition of Penalty.--If any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud.

(b) Determination of Portion Attributable to Fraud.--If the Secretary establishes that any portion of an underpayment is attributable to fraud, the entire underpayment shall be treated as attributable to fraud, except with respect to any portion of the underpayment which the taxpayer establishes (by a preponderance of the evidence) is not attributable to fraud.

B.  Underpayment of Tax

Petitioners concede that they underpaid their taxes for each year to which the notices of deficiency apply.  We conclude as to each of those years that respondent has met the first part of his burden of proof; i.e., establishing underpayments of tax.

C.  Presence of Fraud

The second part of respondent's burden requires that he establish the presence of fraud.  Fraud requires an intentional wrongdoing on the part of a taxpayer with the specific purpose of evading a tax believed to be owing.  See Powell v. Granquist, supra at 60; Miller v. Commissioner, supra at 332.  Such a fraudulent intent is present where a taxpayer files a return intending to conceal, mislead, or otherwise prevent the collection of tax.  See Spies v. United States, 317 U.S. 492, 499 (1943); Akland v. Commissioner, 767 F.2d 618, 621 (9th Cir. 1985), affg. T.C. Memo. 1983-249; Beaver v. Commissioner, 55 T.C. 85, 93 (1970).  A finding of a fraudulent intent is a factual determination that turns on the facts and circumstances of the case.  See Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978).  Where fraud is determined for multiple years, as here, the Commissioner must establish a fraudulent intent for each year in order to prevail for all years.  See Otsuki v. Commissioner, 53 T.C. 96, 105 (1969).

Fraud is never presumed or imputed; it must be established by independent evidence that establishes a fraudulent intent on the taxpayer's part. See Niedringhaus v. Commissioner, 99 T.C. 202, 210 (1992). Because direct proof of a taxpayer's intent is rarely available, fraud may be proven by circumstantial evidence and reasonable inferences may be drawn from the relevant facts. See id. We often rely on certain indicia of fraud to decide whether fraud is present. The "badges of fraud" include: (1) Understatement of income; (2) maintenance of inadequate records; (3) failure to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealment of income or assets; (6) failure to cooperate with tax authorities; (7) engaging in illegal activities; (8) dealing in cash; (9) failure to make estimated tax payments; and (10) filing false documents. See Estate of Trompeter v. Commissioner, 279 F.3d 767, 773 (9th Cir. 2002), vacating and remanding 111 T.C. 57 (1998); Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Recklitis v. Commissioner, 91 T.C. 874, 910 (1988); see also Spies v. United States, supra at 499-500.

Respondent argues that the Rowells are financially sophisticated and tax-savvy individuals who were intimately involved with and highly knowledgeable of petitioners' finances and who consciously perpetrated a scheme for petitioners to evade Federal income taxes by understating income and overstating

deductions.  We are not clearly convinced that such is the case. Nor are we persuaded by respondent's view of the indicia of fraud that support his findings of fraud.

First, we disagree with respondent's view that the Rowells' understanding of taxes and their involvement with and knowledge of petitioners' finances support the requisite finding of fraud. The record establishes, and we find as facts, that neither of the Rowells is proficient on the subject of tax law or on the requirements thereof and that each of the Rowells devoted long hours to his or her profession to the neglect of recordkeeping responsibilities.  In addition, we are left unpersuaded by the record that the Rowells knew that petitioners' reported tax liabilities failed to reflect petitioners' true tax liabilities. Although respondent notes that Mr. Rowell was the source of most of the data reported on petitioners' returns, we do not find that Mr. Rowell understood the tax significance of that data or sufficiently consulted petitioners' records (or attempted to compile supporting documentation) before giving that data to Mr. Cutter.  We do find, however, that Mr. Cutter was of limited assistance to the Rowells when it came to their receiving professional advice on the preparation of petitioners' returns and that he chose to prepare those returns quickly rather than accurately.

Second, we disagree with respondent's view that petitioners' underreporting of income on each of the subject returns leads to a finding that petitioners intended to evade Federal income tax. Instead, as similarly discussed above, it appears more likely that the underpayments in these cases were due to the Rowells' attempt to file petitioners' tax returns without properly and sufficiently reviewing petitioners' records and to Mr. Rowell's belief that PLC's unrecovered advanced client costs and Knutsen's inventory purchases, each of which was substantial in amount, would sufficiently offset PLC's and Knutsen's income for those years.

Third, we disagree with respondent's view that petitioners failed to maintain adequate records with an intent to evade Federal income tax. Petitioners maintained their records in Quicken, their computerized accounting system, but they failed to maintain sufficient documentation to support their entries into the Quicken database. The Rowells also did not maintain sufficient records to allow them to ascertain the expenses incurred by them and by each of the corporate entities. The Rowells had themselves and two other taxpayers to account for, and they failed to respect the separate status of each of the subject corporations. Under the facts at hand, however, we are not clearly convinced that petitioners' recordkeeping deficiencies in these cases were attributable to fraud as

respondent asserts. It appears more likely, as we find, that petitioners' recordkeeping deficiencies are the result of negligence as petitioners concede.

Fourth, we disagree with respondent's view that the Rowells failed to cooperate with respondent during the audit in a further attempt to evade Federal tax. By the agent's own admission, respondent's determination of fraud was spearheaded by the slow pace at which Mr. Rowell was allowing the agent to complete the audit. While Mr. Rowell did in fact reschedule many appointments with the agent because of conflicts with his work schedule, and he was slow to get documents to the agent as requested, Mr. Rowell eventually met with the agent on various occasions and he repeatedly provided the agent with documents and with answers. On one occasion, for example, at the beginning of the audit, the agent demanded of Mr. Cutter that Mr. Rowell appear in person by the end of the day. Mr. Rowell complied with that demand, almost immediately abandoning his work commitments to appear before the agent shortly thereafter and to allow the agent to interview him at length. Mrs. Rowell also met with and allowed herself to be interviewed by the agent. Mr. Rowell also tried earnestly on the basis of the limited information he had to provide a solid foundation to respondent to support the deductions claimed on petitioners' returns. Mr. Rowell, on behalf of petitioners, also agreed with respondent's requests to extend the applicable

periods of limitation for assessment so that a more complete audit could be performed. While it appears that Mr. Rowell may have made some inconsistent statements to the agent during the audit and provided to the agent some documents which were facially inconsistent with each other, we do not conclude in the setting of the record as a whole that he consciously did so to hinder the audit.[19]

Fifth, we disagree with respondent's view that fraud is found in the fact that the Rowells caused the subject corporations to pay the Rowells' personal expenses. The Rowells use of corporate funds to pay their personal expenses and their use of their personal credit cards to pay the subject corporations' business expenses appear to us to be the result of seeking convenience and lack of attention to detail rather than a conscious and clever scheme to avoid Federal income taxes as asserted by respondent. The Rowells repeatedly used corporate funds to pay their personal expenses, and they apparently thought (without a supporting foundation) that the payments were loans from the subject corporations to their shareholders (or

---

[19]Respondent also asserts that the Rowells failed to cooperate in the audit in that they did not inform the agent they had filed the amended California returns and did not volunteer information or documents on their and their corporations' financial holdings. We do not believe that the matter in those assertions is indicia of fraud in the setting of these cases.

repayments of such loans).[20]  Mr. Rowell had a loan repayment due from the corporation in 1999 which was accepted as such by respondent.  Subsequently, he was cavalier about maintaining accurate records of the amounts paid by the corporation for his benefit, but we see his actions as negligent rather than fraudulent.  While the subject corporations may have deducted some of these personal payments as business expenses, we are left unconvinced on the basis of the record at hand that the corporations did so intending to evade tax.

Respondent also finds fraud in the $100,000 transfer to Ms. Raposa and the fact that PLC failed to report income that it received as a partner of the Cheong firm.  We do not do the same. We consider it unlikely that Mr. Rowell would have entered into a fraudulent transaction as to the $100,000 given that at the time petitioners were under examination by the Internal Revenue Service.  We also consider it unlikely that Mr. Rowell was consciously attempting to conceal the income he received from the Cheong firm given that the firm had reported that amount to both Mr. Rowell and to the Internal Revenue Service.  For the same reason, we also do not believe that PLC's failure to report its interest income correctly was a conscious attempt to conceal its receipt of that income.  Nor do we believe that PLC's isolated

---

[20]This explains to our satisfaction why the Rowells did not report all of the constructive distributions as income.

deposits into the Rowells' personal bank account of the $8,220 in legal fees and the $27,073 in chess winnings evidences that intent.[21]

D. Conclusion

After our detailed review of the facts and circumstances of these cases, in conjunction with our analysis of the applicable badges of fraud, we conclude that respondent has not clearly and convincingly proven a fraudulent intent on the part of any petitioner. We hold that none of petitioners is liable for a fraud penalty under section 6663.

VI. Epiloque

All of the parties' arguments have been considered. We have rejected those not discussed herein as meritless. Accordingly,

Decisions will be entered

under Rule 155.

---

[21]Respondent also finds fraud in the Rowells' misrepresentation of their income to a proposed mortgagee and to the State of California. While we do not condone that practice, we do not view these actions as clear and convincing evidence of the requisite fraudulent intent.