# United States Tax Court

T.C. Memo. 2022-124

ROBERT LEWIS STARER AND MERLE ANN STARER,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 615-13.                                Filed December 20, 2022.

————

*Douglas E. Kahle*, for petitioners.

*Timothy B. Heavner* and *Robert J. Braxton*, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, *Judge*: Petitioners Robert Lewis Starer and Merle Ann Starer are controlling shareholders of the Bayview Corp. (Bayview), an S corporation that operates agriculture and horse-breeding businesses. It also serves as a holding company for their family's primary residence, a farm, and several unimproved subdivided properties initially marked for development. From 2006 until 2010, Bayview engaged in a series of transactions to transfer six of its unimproved subdivided properties to various third parties. Two of these transfers were effectively made gratuitously. The other four transfers were made in exchange for cash plus a repurchase agreement compelling Bayview to repurchase the property for its original net purchase price upon demand of the transferees. Bayview reported these four transactions as nontaxable loans[1] in its books on the grounds that it had obligations under the

————

[1] Hereinafter, any reference to "loans" is for ease of referring to petitioners' arguments and is not meant as a characterization of the substances of the transaction(s) by the Court.

**[\*2]** repurchase agreements to reacquire the transferred properties and repay the transferees.

After conducting an examination of Bayview's tax reporting, respondent determined Bayview's repurchase obligations to be illusory, and that being the case, the four transfers made in exchange for consideration should have been characterized as sales while the two effectively gratuitous transfers constituted distributions of appreciated property. Respondent made adjustments to subject these transactions to taxation and discovered additional deficiencies through the course of his examination.

By notice of deficiency dated October 12, 2012, respondent determined deficiencies in federal income tax of $616,558, $167,086, and $580,035, and accuracy-related penalties under section 6662(a)[2] of $123,312, $33,417, and $116,007, for petitioners' taxable years 2008, 2009, and 2010 (years in issue), respectively.

The issues to be decided are: (1) whether any resulting tax liabilities from the transactions in issue should pass through to petitioners' two grantor trusts as shareholders of record in Bayview or to petitioners as reported on Bayview's tax return; (2) whether respondent's determination that Bayview's accounting of four transfers of property should be treated as sales rather than loans constitutes a change in petitioners' method of accounting, and if so, whether respondent abused his discretion in making the foregoing determination; (3) whether two transfers of property constitute constructive distributions of appreciated property from Bayview to petitioners; (4) whether petitioners' rent-free use of their home in 2008, 2009, and 2010 constitutes a constructive dividend from Bayview to petitioners; (5) whether Bayview is entitled to a bad debt deduction for 2008; and (6) whether petitioners are liable for section 6662(a) accuracy-related penalties for the years in issue.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The Stipulations of Fact and the attached Exhibits are hereby incorporated

---

[2] Unless otherwise indicated, all statutory references are to the Internal Revenue Code (Code), Title 26 U.S.C., in effect at all relevant times, all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. Monetary amounts are rounded to the nearest dollar.

[*3] by this reference. Petitioners, husband and wife, resided in Virgina when they timely filed the Petition.

I.     *Petitioners' Businesses*

Petitioners are controlling shareholders and corporate officers of Bayview, a Virginia corporation electing to be taxed as an S corporation for federal income tax purposes. In addition to Bayview, petitioners held controlling ownership in and served as corporate directors of two other closely held corporations, Village Builders, Inc. (Village Builders) and Historic Arms, Inc. (Historic Arms), at relevant times during the years in issue. Village Builders, a now-defunct Virginia C corporation dissolved in 2008, operated a construction business that built modular homes. Historic Arms, a Delaware C corporation, continues to operate a firearms training and dealing business. Petitioners and their related entities operated under the cash method of accounting for all relevant taxable years.

II.    *Bayview*

Bayview is the owner of several contiguous parcels of real property (collectively known as Scott's Farm) in Cape Charles, Virginia. Scott's Farm was acquired in 1995 for $795,000 and improved by a 4,688-square-foot residence, a horse barn, an airplane landing strip, and a swimming pool. In 2006 a portion of Scott's Farm was subdivided into eight lots (numbered Lots 1 through 8) totaling 17.81 acres. Bayview's basis in each lot is $23,520.

As outlined below, petitioners had several longstanding relationships with individuals who would eventually become parties to the transactions in issue. Those transactions consist of six transfers of its subdivided properties; Lots 3 through 6 were transferred in exchange for consideration while Lots 1 and 2 were effectively transferred gratuitously. Lots 7 and 8 remain assets of Bayview.

A.     *Relationships With Parties to the Transactions*

Petitioners first became acquainted with an individual named Thomas Wilson when he unexpectedly landed his airplane on their landing strip. Their relationship progressed into engaging in business transactions, such as Mr. Starer's drawing upon his banking relationships to secure financing for Mr. Wilson's purchase of a plane. They eventually entered into real estate transactions together after petitioners learned Mr. Wilson was a significant real estate investor

[*4] with an eye towards investing in the county wherein petitioners lived. Mr. Wilson subsequently passed away in an airplane crash in 2011.

William Messick is a construction manager from Pennsylvania who received a bachelor of science degree in electrical engineering from Lafayette College. Mr. Messick owns and operates WLM Management, Inc. (WLM Management), a company that provides property and construction management services, as well as several other companies through which he offers consulting services. Mr. Messick and petitioners have a long-standing business and personal relationship stretching over 15 years preceding the date of trial in this case. Their relationship began when petitioners contracted one of Mr. Messick's companies to perform construction services in Pennsylvania. Mr. Messick thereafter reciprocated by hiring Village Builders to construct a chain of residences and purchasing an office building owned by petitioners. Immediately before and during the years in issue, several transfers of cash were made between entities controlled by Mr. Messick and petitioners. From 2006 to 2008 Bayview transferred a total of $1,485,058 to WLM Management while WLM Management transferred a total of $244,000 to Bayview. By the end of 2008, Mr. Messick was experiencing significant cashflow problems brought on by the 2008–09 global financial crisis, which led to economic strain on his businesses.

Valerie and William C. Harvey met petitioners through their relationship with petitioners' son-in-law, Eric Smith, who worked with Mr. Harvey at a real estate development company called Armada Hoffler. Mr. Smith had informed the Harveys of a real estate investment opportunity offered by petitioners. Although they were not in the market to invest in real estate at the time, the Harveys viewed the structure of the deal as an investment akin to that of a high-interest loan that would result in a balloon payment at the end of a specified term. The Harveys had no business relationship with petitioners before the years in issue.

For his part, Mr. Smith serves as the chief investment officer of Armada Hoffler after having worked as a management consultant for Booz Allen Hamilton. He received a degree in finance from the University of Pennsylvania. Mr. Smith had never advised the Harveys on real estate transactions before informing them of the investment opportunity offered by petitioners. Mr. Smith had been petitioners' son-in-law for approximately 15 years as of the date of trial, and in that time, they developed a history of engaging in business deals surrounding real

[*5] estate. A typical deal involved Mr. Smith's acquiring financing for properties whereon petitioners planned to build houses. Once a house had been built, they would sell the property together and split the profits therefrom evenly. Throughout the record, petitioners often note the trust they developed in Mr. Smith following the successful conclusion of countless comparable deals.

B.    *Transfers Made in Exchange for Consideration*

1.    *Lots 3 and 5*

On December 27, 2006, Bayview sold Lots 3 and 5 to Mr. Wilson for $795,000 each. Mr. Wilson used the lots as collateral to obtain two loans totaling $1 million from PNC Bank in order to finance the purchases. Simultaneously with the transfers of title to Lots 3 and 5, the transacting parties executed two nonassignable repurchase agreements whereby Mr. Wilson acquired the right to compel Bayview to repurchase the lots for the net proceeds of the original sales. Bayview reported the sales to Mr. Wilson as loans in its books and as "repurchase obligations" that increased its liabilities on its Form 1120S, U.S. Income Tax Return of an S Corporation, for tax year 2006. Mr. Wilson never exercised either repurchase agreement; instead, on February 11, 2010, he conveyed both Lots 3 and 5 to PNC Mortgage in foreclosure. PNC Bank, as the highest and last bidder of the properties, paid the County of Northampton, as trustee of the properties, $108,000 and $117,000 at a public foreclosure sale in consideration for the titles to Lots 3 and 5, respectively.

2.    *Lot 4*

On January 19, 2007, Bayview sold Lot 4 to Mr. Messick for $800,000. Mr. Messick used Lot 4 as collateral to borrow $640,000 from National City Mortgage in order to finance the purchase. He purchased Lot 4 intending to develop the property and build a house but accomplished neither. As in the sales of Lots 3 and 5, the transacting parties executed a repurchase agreement coinciding with the transaction whereby Mr. Messick acquired the right to compel Bayview to repurchase the lot for the net proceeds of the original sale. Bayview reported the sale to Mr. Messick as a loan in its books and accordingly increased its liabilities under the "repurchase obligations" label on its Form 1120S for tax year 2007. As with Mr. Wilson, instead of invoking his right under the repurchase agreement to compel Bayview to repurchase the property for the net proceeds of the original sale,

[*6] $729,028, Mr. Messick conveyed Lot 4 to National City Mortgage in foreclosure in August 2009. National City Mortgage, as the highest and last bidder on the property, paid the County of Northampton, as trustee of the property, $225,000 at a public foreclosure sale in consideration for the title to Lot 4.

### 3. *Lot 6*

On September 14, 2007, Bayview sold Lot 6 to the Harveys for full consideration of $788,096 despite recording a purchase price of $925,000. The transacting parties also executed a repurchase agreement. The terms therein and the subsequent invocation thereof varied from those of the previous two transactions. This repurchase agreement included a ground lease whereby the Harveys agreed to lease Lot 6 to WLM Management in exchange for payments of rent, and, if WLM Management defaulted on its rental payments, the Harveys had the right per an acceleration clause to compel Bayview to repurchase the property for the net proceeds of the original sale. The repurchase agreement also entitled the Harveys to receive unreimbursed out-of-pocket expenses incurred in connection with owning Lot 6 and an additional $75,000 added to the original purchase price upon the exercise of their right to compel Bayview to repurchase the property. Bayview reported the sale to the Harveys as a loan in its books and accordingly increased its liabilities under the "repurchase obligations" label on its Form 1120S for tax year 2007.

The Harveys planned to use the proceeds from WLM Management's rental payments to pay the mortgage they acquired to finance their purchase of Lot 6. The amount of the rental payments due under the ground lease coincided with the amounts due on their mortgage. Shortly after the conclusion of the transaction, WLM Management stopped making rental payments and defaulted on its obligation under the ground lease. In October 2009 and March 2010, the Harveys made demands through an attorney to require Bayview to repurchase Lot 6 in accordance with the acceleration clause of the repurchase agreement. Bayview declined to honor its obligation under the repurchase agreement and thereby refused to repurchase Lot 6 from the Harveys. Despite hiring an attorney to make formal demands on their behalf, the Harveys declined to pursue litigation against Bayview for breach of contract. In June 2010 the Harveys conveyed Lot 6 to Eastern Shore Lot, LLC, which was wholly owned by Hampton University.

[*7]   C.   *Gratuitous Transfers*

    1.   *Lot 1*

On June 24, 2008, Bayview conveyed the title to Lot 1 to Mr. Messick. The deed was recorded by the Clerk's Office of Northampton County and a grantor's tax based on a stated value of $895,000 was paid. A sale agreement executed for Lot 1 obligated Mr. Messick to make three payments to Bayview totaling $895,000 in exchange for the title to the lot. A repurchase agreement was not included with this transaction. Mr. Messick did not make any of the payments to Bayview and thereby defaulted on his obligation under the sale agreement. However, Bayview declined to pursue litigation against Mr. Messick as a means to recover the payments.

Mr. Messick did not attempt to develop or sell Lot 1. Instead, he used the lot as collateral to obtain a loan from First Security Bank and deposited the loan proceeds into WLM Management's bank accounts to finance his other business ventures. He later defaulted on his loan obligation to First Security Bank. On January 12, 2010, in full satisfaction of the loan, Mr. Messick conveyed Lot 1 to First Security Bank in a deed in lieu of foreclosure.

    2.   *Lot 2*

On September 17, 2008, Bayview conveyed the title to Lot 2 by general warranty deed to Ravenna Holdings, LLC (Ravenna). The deed was recorded by the Clerk's Office of Northampton County and a grantor's tax was paid based on a stated value of $895,000. However, Ravenna did not in fact pay any consideration in exchange for the conveyance of Lot 2 from Bayview. The deed to Lot 2 shows that Bayview did not retain any rights to the lot following its conveyance to Ravenna. There is no evidence of a written record documenting any other terms or restrictions with respect to the conveyance.

At the time of the conveyance, Mr. Smith, petitioner's son-in-law, was the sole member of Ravenna. He formed Ravenna for the exclusive purpose of holding and selling land to be received from Bayview. At all relevant times, Ravenna's sole asset was the deed to Lot 2. Ravenna neither developed nor sold Lot 2 after receiving the deed. On August 31, 2012, Mr. Smith assigned the entirety of his interest in Ravenna to Bayview, effectively conveying Lot 2 back to Bayview. Bayview did not pay Mr. Smith anything in exchange for the assignment.

**[*8]**  D.  *Petitioners' Rent-Free Use of Personal Residence*

For all relevant taxable years, Bayview owned the title to petitioners' personal residence. Petitioners lived in the residence without paying rent to Bayview. A separate portion of the residence was used for the business operations of Historic Arms pursuant to a rental agreement whereby it paid rent to Bayview for the use of the portions it occupied. Bayview did not have any employment agreements with petitioners specifying whether they were required to live in the residence, nor were petitioners required to live there by state law or regulation. The value of petitioners' rent-free use of the residence was stipulated to be $24,000 per year.

E.  *Intercompany Transfers*

In 2008 Bayview transferred a total of $252,920 to Village Builders while Village Builders transferred a total of $25,920 to Bayview. Bayview classified the transfer of funds to Village Builders as a loan. The corporations did not execute a promissory note nor any other written agreement to establish a record of indebtedness or terms of repayment, interest, or maturity.

Bayview claimed a bad debt deduction of $227,420 on its 2008 Form 1120S in connection with the funds transferred to Village Builders. Village Builders entered debt forgiveness income of $227,420 in its adjusting journal entries for 2008; however, it did not report any cancellation of debt income on its 2008 tax return as required under the 2008 Instructions for Form 1120, U.S. Corporation Income Tax Return.

F.  *Ownership of Bayview*

In August 2003 petitioners conveyed a separate 47% interest comprising nonvoting shares in Bayview to two grantor trusts, Old Plantation Trust and Family Plantation Trust, respectively. The remaining six percent interest comprised voting shares they retained as joint tenants. Bayview did not make allocations or distributions to either trust during any relevant year in issue. On its Forms 1120S from 2006 to 2010, Bayview reported petitioners as each owning 50% of its stock and allocated tax items and distributions accordingly.

**[\*9]** III.    *Notice of Deficiency*

Respondent conducted an examination of Bayview's tax returns for taxable years 2008 through 2010, which led to adjustments of petitioners' individual income tax for the same years.

In the notice issued to petitioners, respondent determined the following deficiencies and accuracy-related penalties pursuant to section 6662(a) for the years in issue:

| Year | Deficiency | I.R.C. § 6662 Penalty |
|------|------------|-----------------------|
| 2008 | $616,558 | $123,312 |
| 2009 | 167,086 | 33,417 |
| 2010 | 580,035 | 116,007 |

The deficiency for 2008 is based on the following adjustments:

| Adjustments for 2008 | Amount |
|----------------------|--------|
| Ordinary income from Bayview: flowthrough adjustment for disallowance of bad debt deduction of $227,420 claimed on Bayview's 2008 Form 1120S<br><br>– original loss of $96,103<br>– corrected loss of $49,809<br>– resulting in adjustment of $46,294 | $46,294 |
| Compensation — fair market rental value of petitioners' home | 24,000 |
| Social Security RRB (computational) | 11,864 |
| Capital gain/loss from sale of property (partially section 481 and partially sales during 2008) | 4,027,926 |
| Exemptions (computational) | 2,334 |
| Alternative minimum tax (computational) | 12,319 |
| Section 481(b) credit (computational) | (9,560) |
| Earned income credit (computational) | 109 |

**[\*10]** The 2008 adjustment for capital gain/loss from the sale of property comprises the following items:

| Description | Amount |
|---|---|
| Section 481 adjustment of repurchase loans reported on Bayview's return concerning transfers of Lots 3, 4, 5, and 6 | $2,387,585 |
| Receipt of appreciated property from Bayview through transfer of Lot 1 in 2008 | 895,000 |
| Receipt of appreciated property from Bayview through transfer of Lot 2 in 2008 | 895,000 |
| Less basis in Lots 3, 4, 5, and 6 | (94,080) |
| Less basis in Lots 1 and 2 | (47,040) |
| Capital loss allowed | (8,539) |
| **Total Capital Gain** | **$4,027,926** |

The deficiency for 2009 is based on the following adjustments:

| Adjustments for 2009 | Amount |
|---|---|
| Debt cancellation[3] | $545,487 |
| Compensation — fair market rental value of petitioners' home | 24,000 |
| Social Security RRB (computational) | 12,540 |
| Exemptions (computational) | 2,434 |

---

[3] The debt cancellation adjustment is an alternative position, presented in the event we found against respondent on the section 481 adjustment. Because we hold for respondent on the section 481 adjustment, we do not uphold the debt cancellation adjustments. We direct the parties to clearly reflect the determination in their Rule 155 computations.

**[\*11]** The deficiency for 2010 is based on the following adjustments:

| Adjustments for 2010 | Amount |
|---|---|
| Debt cancellation[4] | $1,721,357 |
| Compensation — fair market rental value of petitioners' home | 24,000 |
| Social Security RRB (computational) | 20,368 |

Petitioners timely petitioned this Court for redetermination.

## OPINION

I.   *Burden of Proof*

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and taxpayers bear the burden of proving them incorrect. *See* Rule 142(a)(1); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Petitioners have not shown that the threshold requirements of section 7491(a) have been met as required to shift the burden of proof to respondent.[5] As a result, the burden remains on petitioners to prove that respondent's determinations are in error with respect to all issues.

---

[4] *See supra* note 3.

[5] At trial petitioners conceded that they carry the burden of proof on all issues. Yet in their posttrial briefs, petitioners attempt to raise a new issue that they neither pleaded in their Petition nor argued at trial: They contend respondent's determinations are arbitrary, preclude the attachment of the presumption of correctness to respondent's determinations, and shift the burden of proof to respondent. In their briefs petitioners maintain that respondent issued a "naked" notice of deficiency void of any supporting evidence, and therefore, the adjustments in the notice are erroneous. They cite several cases that stand for the proposition that respondent must offer foundational support for a deficiency determination to reap the benefit of the presumption of correctness. We will not consider this untimely argument. In certain circumstances an issue not raised by the pleadings may be "tried by express or implied consent of the parties . . . [and] treated in all respects as if they had been raised in the pleadings." Rule 41(b)(1). However, we have held that when a party is not aware of an issue at trial, he cannot be held to have expressly or impliedly consented to the trial of that issue, as required for application of Rule 41(b). *See Markwardt v. Commissioner*, 64 T.C. 989, 998 (1975). This Court has held on multiple occasions that we will not consider issues raised for the first time at trial (or on brief) on account of the lack of notice and consequent prejudice to the opposing party. *See, e.g., Estate of Mandels v. Commissioner*, 64 T.C. 61, 73 (1975); *Genecure, L.L.C. v.*

**[\*12]** II.  *Shareholders of Bayview*

As a preliminary matter, petitioners take the position that any tax liabilities resulting from this deficiency proceeding should pass through to the two grantor trusts established in 2003 on the grounds that they transferred to each trust 47% of Bayview's outstanding shares before the years in issue.  Respondent on the other hand contends that any resulting tax liabilities should flow through to petitioners proportionately as reported on Bayview's Form 1120S for each year in issue.

In general, a corporation electing to be taxed as an S corporation does not pay tax at the corporate level.  I.R.C. § 1363(a).  Rather, an S corporation shareholder reports a pro rata share of the S corporation's income, loss, and credit items on a per-share, per-day basis for the shareholder's taxable year in which the S corporation's taxable year ends.  I.R.C. § 1366(a).  An S corporation shareholder is required to recognize his or her percentage share of the S corporation's items of income for any taxable year even if the shareholder does not receive a distribution from the S corporation for that year.  Treas. Reg. § 1.1366-1(a)(1); *see also Jones v. Commissioner*, T.C. Memo. 2010-112, 2010 WL 2011013, at \*3.

Certain trusts may be eligible shareholders of an S corporation under section 1361(c)(2).  As relevant here, a grantor trust may be treated as a shareholder of an S corporation under section 1361(c)(2)(A)(i).[6]  Under section 671, the deemed owners of a grantor trust are taxable on the trust's income attributable to them.  *See, e.g.*, *Madorin v. Commissioner*, 84 T.C. 667, 675 (1985).  A trust may also be eligible to be a shareholder of an S corporation under section 1361(c)(2)(A)(v) (electing small business trust or ESBT), which would

---

*Commissioner*, T.C. Memo. 2022-52; *Friedman v. Commissioner*, T.C. Memo. 1992-588, *aff'd without published opinion*, 48 F.3d 535 (11th Cir. 1995).  Moreover, even if we were to entertain the argument, it would fail in the light of the fact that the record is replete with evidence demonstrating the foundation for respondent's determinations including, but not limited to, petitioners' individual tax returns, Bayview's tax returns, deeds of sale, purchase/sale agreements, repurchase agreements, bank statements, and foreclosure statements.

[6] Section 1361(c)(2)(A)(i) describes one permissible S corporation shareholder as "[a] trust all of which is treated (under subpart E of part I of subchapter J of this chapter) as owned by an individual who is a citizen or resident of the United States." *See also* Treas. Reg. § 1.1361-1(h)(1)(i) and (ii).  Treasury Regulation § 1.1361-1 refers to a grantor trust as a "qualified subpart E trust."

[*13] treat current beneficiaries as the shareholders of the S corporation for tax purposes, or if no current beneficiaries, then the trust as the shareholder of the S corporation under section 1361(c)(2)(B)(v). In order to qualify as an ESBT, the trust must elect to be taxed as such. This requires the filing of an ESBT election and an ESBT statement in accordance with the provisions of Treasury Regulation § 1.1361-1(m)(2)(i) and (ii)(A).

Petitioners argue that, because of the grantor trust status of each trust, Bayview properly issued Schedules K–1, Shareholder's Share of Income, Deductions, Credits, etc., solely to petitioners in accordance with section 671. They claim never to have filed a Form 1041, U.S. Income Tax Return for Estates and Trusts, for either trust because neither trust received reportable distributions of income from Bayview during the years in issue. Notwithstanding that claim, petitioners maintain that even if there was reportable income to either trust, the S corporation election enables them as individuals to be liable for 100% of such income. We understand this as a contention that petitioners made a proper ESBT election for both trusts; however, there is no evidence in the record demonstrating that petitioners filed the required election or election statement as required by Treasury Regulation § 1.1361-1(m)(2)(i) and (ii)(A). The lack of this evidence would result in unintended consequences but for the parties' agreement that the trusts in issue qualify as grantor trusts.[7]

Neither the evidence nor petitioners' contentions lend credence to their position that any resulting tax liabilities from the transactions in issue should pass through to the trusts. If we were to accept petitioners' contention that the trusts own the S corporation shares and are grantor trusts or valid ESBTs for income tax purposes, petitioners would continue to be taxed on their individual income tax returns for any allocations of tax items made to the trusts. *See* I.R.C. § 1361(c)(2)(B)(i), (v). Similarly, the shareholder information reported on Bayview's tax returns shows petitioners as each owning 50% of Bayview, and tax items were allocated accordingly. We find that petitioners failed to demonstrate that any resulting tax liabilities from the transactions in issue should flow through to the trusts. Consequently, any resulting liabilities shall pass through to petitioners individually in accordance

---

[7] If the trusts did not qualify as grantor trusts and failed to make valid ESBT elections, the transfer of Bayview's stock to the trusts would result in the termination of Bayview's status as an S corporation for ceasing to be a small business corporation as defined by section 1361(b). *See* I.R.C. § 1362(d)(2); Treas. Reg. § 1.1362-2(b)(1).

**[\*14]** with their pro rata share of Bayview's tax items as reported on Bayview's Forms 1120S for the relevant year.

III.  *Section 481 Change in Method of Accounting Adjustment to Clearly Reflect Income*

Section 446(a) sets forth the general rule that "[t]axable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books."  If a taxpayer's method of accounting does not clearly reflect income, the Commissioner is authorized to impose a change on the taxpayer's method of accounting that, in his opinion, does clearly reflect income. *See* I.R.C. § 446(b); Treas. Reg. § 1.446-1(b)(1).  The Commissioner has broad discretion in determining whether a taxpayer's method of accounting clearly reflects income.  *See Thor Power Tool Co. v. Commissioner*, 439 U.S. 522 (1979); *RCA Corp. v. United States*, 664 F.2d 881 (2d Cir. 1981).  Once he determines that a taxpayer's method of accounting does not clearly reflect income and thereafter uses his authority to select a method of accounting that he believes does clearly reflect income, the Commissioner's selection may be challenged successfully only upon a demonstration of an abuse of discretion.  *See Wilkinson-Beane, Inc. v. Commissioner*, 420 F.2d 352, 353 n.3 (1st Cir. 1970), *aff'g* T.C. Memo. 1969-79; *Standard Paving Co. v. Commissioner*, 190 F.2d 330, 332 (10th Cir. 1951), *aff'g* 13 T.C. 425 (1949); *Drazen v. Commissioner*, 34 T.C. 1070, 1076 (1960).

One of the mechanisms by which the Commissioner effects his discretionary authority under section 446(b) is through operation of section 481.  If there has been a change in a taxpayer's method of accounting for any taxable year (year of change) which is different from the method used for the preceding taxable year, section 481(a) authorizes the Commissioner to adjust the taxpayer's taxable income for the year of change to account for those adjustments determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted.  *See Primo Pants Co. v. Commissioner*, 78 T.C. 705, 720 (1982).  It is well established that, when applicable, section 481 may affect closed years (i.e., years barred by the statute of limitations) and permits the Commissioner to adjust a taxpayer's income for the year of change for income earned but unreported for otherwise closed years under the taxpayer's previous method of accounting.  *See Graff Chevrolet Co. v. Campbell*, 343 F.2d 568, 572 (5th Cir. 1965); *see also Suzy's Zoo v. Commissioner*, 114 T.C. 1, 13 (2000),

[*15] *aff'd*, 273 F.3d 875 (9th Cir. 2001); *Superior Coach of Fla., Inc. v. Commissioner*, 80 T.C. 895, 912 (1983).

A "method of accounting" includes not only the taxpayer's overall plan of accounting for gross income or deductions but also the taxpayer's accounting treatment for any "material item" within the overall plan. Treas. Reg. §§ 1.481-1(a)(1), 1.446-1(e)(2)(ii). A material item is any item that involves the proper time for the inclusion of the item in income or the taking of a deduction. Treas. Reg. § 1.446-1(e)(2)(ii)(*a*). If a change leaves a taxpayer's lifetime taxable income constant but affects when it is recognized, the change concerns an "item that involves the proper time for the inclusion of [an] item in income or the taking of a deduction" and implicates a change in method of accounting. *See id.*

The Court has applied these concepts in the context of section 481 adjustments by focusing on whether a taxpayer's accounting practice permanently distorts the taxpayer's lifetime income. Where a taxpayer's accounting practice permanently avoids reporting of income and accordingly distorts its lifetime income, the practice is not a method of accounting and section 481(a) is inapplicable to a change of the accounting practice. *Schuster's Express, Inc. v. Commissioner*, 66 T.C. 588 (1976), *aff'd without published opinion*, 562 F.2d 39 (2d Cir. 1977). On the other hand, when an accounting practice merely postpones the reporting of income, rather than permanently avoiding the reporting of income over the taxpayer's lifetime, it involves the proper time for reporting income. *Wayne Bolt & Nut Co. v. Commissioner*, 93 T.C. 500, 510 (1989); *Copy Data, Inc. v. Commissioner*, 91 T.C. 26, 30 (1988); *Primo Pants Co.*, 78 T.C. at 723; *Schuster's Express, Inc.*, 66 T.C. at 597.

Respondent did not require Bayview to change its overall plan of accounting for gross income or deductions but merely required it to change the treatment of reporting its transfers of property from loans to sales. Petitioners concede that the transactions should be recharacterized as sales, and we agree. Petitioners dispute, however, that the change in the treatment of Bayview's accounting for its transfers of Lots 3, 4, 5, and 6 from loans to sales constitutes a change in method of accounting for purposes of section 481. "[A] change in method of accounting does not include adjustment of any item of income or deduction that does not involve the proper time for the inclusion of the item of income or the taking of a deduction." Treas. Reg. § 1.446-1(e)(2)(ii)(*b*).

**[\*16]** Petitioners contend that the accounting practice at issue here is a direct parallel to a practice the Court analyzed in *Saline Sewer Co. v. Commissioner*, T.C. Memo. 1992-236, 1992 Tax Ct. Memo LEXIS 245. In *Saline Sewer* we held that "the failure to report customer connection fees as income, and instead treat them as contributions to capital pursuant to section 118, is clearly not a timing issue." *See id* at \*9. We found that the mischaracterization caused a permanent distortion of the taxpayer's taxable income, and accordingly, the Commissioner's recharacterization of these receipts as taxable income did not give rise to section 481 adjustments. *See id* at \*9–10. Petitioners contend that Bayview's practice of reporting the transfer proceeds as liabilities did not merely defer the recognition of income; it served to permanently avoid reporting as income the net gain from what petitioners have since stipulated were sales of Bayview's property. Petitioners concede that Bayview's accounting method was improper because these transfers were in fact sales.

Petitioners overstate their case. We agree that the transactions in issue were sales because Bayview never intended to fulfill its repurchase obligations.[8] Bayview improperly deferred gains realized in

---

[8] As noted in the Court's Order denying petitioner's Motion for Partial Summary Judgment dated February 21, 2014, for a payment to constitute a nontaxable loan at the time the payments are received, the recipient must intend to repay the amounts and the transferor must intend to enforce payment. *See Haag v. Commissioner*, 88 T.C. 604, 615–16 (1987), *aff'd without published opinion*, 855 F.2d 855 (8th Cir. 1988); *Beaver v. Commissioner*, 55 T.C. 85, 91 (1970). Further, the obligation to repay must be unconditional and not contingent on a future event. *United States v. Henderson*, 375 F.2d 36, 39 (5th Cir. 1967); *Haag*, 88 T.C. at 616. We also noted that the proceeds from a loan "do not constitute income because whatever temporary economic benefit the borrower derives from the use of the funds is offset by the corresponding obligation to repay them." *Moore v. United States*, 412 F.2d 974, 978 (5th Cir. 1969).

Even without petitioners' concession, the record provides an abundance of evidence that Bayview's obligations under the repurchase agreements were too contingent upon future events to evince an unconditional obligation to repay the amounts received from the transfers, and that the transactions were not true loans and were never intended to be true loans. At trial, Mr. Messick, who purchased Lot 4, testified to being friends with and a longtime business associate of petitioners. When asked why he did not invoke his right to repayment under the repurchase agreement rather than allow the lot to be foreclosed upon (which would have netted him a higher overall return), Mr. Messick explained he did not consider it to be an option because of the ongoing financial crisis. This explanation is difficult to reconcile with the fact that Mr. Messick had been experiencing cashflow problems at the time and presumably would have been looking for efficient ways to raise capital. Petitioners claimed that

[*17] 2006 and 2007 by incorrectly reporting its transfers of property as loans rather than sales. Consequently, the proceeds resulting from the transfers would have inevitably been reportable as cancellation of debt income for later years.[9] The change in accounting method results in Bayview's having no outstanding debt to cancel, and therefore to recognize as income, for 2008. Section 481 was designed to cure the distortions of taxable income resulting from changes in the taxpayer's method of accounting. *Grogan v. United States*, 475 F.2d 15 (5th Cir. 1973); *Graff Chevrolet Co.*, 343 F.2d at 572. Section 481 assures that the taxpayer's income is reported correctly for the year of change and that the distortion is taken into account in accordance with that section. If section 481 were not applicable, the amount Bayview received for its transfer of property would be omitted from income as a result of the change in accounting method in 2008 recharacterizing the transactions from loans to sales.

In the light of the foregoing, we find that petitioners failed to demonstrate that Bayview's accounting practice permanently distorted its lifetime income. Because respondent's adjustments affect the timing of the inclusion of income deferred by Bayview, we find that the change affects a material item and therefore constitutes a change in method of accounting. *See* Treas. Reg. §§ 1.481-1(a)(1), 1.446-1(e)(2)(ii). To assure petitioners' income is reported correctly as a result of this change in method of accounting, section 481 requires that the income received from the transfers be recognized for 2008. *See Superior Coach of Fla., Inc.*, 80 T.C. at 912 (holding that there is no conflict between section 481 and the statute of limitations because the statute of limitations is directed towards stale claims, and, until the year of change, the

---

Mr. Wilson, who purchased Lots 3 and 5, became known to them when he serendipitously landed his airplane on their airstrip one day. He likewise neglected to invoke the repurchase agreements accompanying his transactions with Bayview before his death in 2011. The Harveys, who purchased Lot 6, were the only transferees to invoke their right under the repurchase agreement to compel Bayview to repurchase the lot. Most importantly, Bayview rebuffed the Harveys' claim and declined to repurchase the property. Despite Bayview's default on its obligation, the Harveys did not file a lawsuit to enforce their rights under the repurchase agreement even though Mr. Harvey testified that they had fulfilled their obligation thereunder by providing full consideration for Lot 6.

[9] The only way Bayview's accounting practice would have permanently distorted its lifetime income would have been if it had intended from the start to mischaracterize the sales as loans and purposefully fail to report cancellation of debt income. Neither party contends this to have been the case, and at this time we decline to find it was so.

**[\*18]** Commissioner has no claim against the taxpayer for amounts which the taxpayer should have reported for prior years).

Finally, petitioners do not contend that respondent abused his discretion in making the changes to Bayview's method of accounting and thereupon have conceded the issue. *See Leahy v. Commissioner*, 87 T.C. 56, 73–74 (1986). Consequently, we sustain respondent's section 481 adjustments.

IV.    *Constructive Transfers*

Generally, unless otherwise provided, gross income under section 61 includes all accessions to wealth from whatever source derived. *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 431 (1955). Moreover, "gain . . . constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it. That occurs when [property] . . . is delivered by its owner to the taxpayer in a manner which allows the recipient freedom to dispose of it at will . . . ." *Rogers v. Commissioner*, T.C. Memo. 2011-277, 2011 WL 5885083, at \*2 (quoting *Rutkin v. United States*, 343 U.S. 130, 137 (1952)), *aff'd*, 728 F.3d 673 (7th Cir. 2013); *see also United States v. Rochelle*, 384 F.2d 748, 751 (5th Cir. 1967); *McSpadden v. Commissioner*, 50 T.C. 478, 490 (1968). The economic benefit accruing to the taxpayer is the controlling factor in determining whether gain is income. *Rutkin*, 343 U.S. at 137; *Rochelle*, 384 F.2d at 751.

When a corporation confers an economic benefit upon a shareholder without expectation of reimbursement, that economic benefit becomes a constructive distribution[10] and is taxable as such. *See Loftin & Woodward, Inc. v. United States*, 577 F.2d 1206, 1214 (5th Cir. 1978). A distribution need not be formally declared or even intended by a corporation but can be constructive. *Noble v. Commissioner*, 368 F.2d 439, 442–43 (9th Cir. 1966), *aff'g* T.C. Memo. 1965-84. Whether a distribution is a constructive distribution depends on whether it was made primarily for the benefit of the shareholder. *See Hood v. Commissioner*, 115 T.C. 172, 179–80 (2000). The determination of

---

[10] The Court uses the term "constructive distribution" to describe what our caselaw has sometimes referred to as a "constructive dividend." *See, e.g.*, *Key Carpets, Inc. v. Commissioner*, T.C. Memo. 2016-30, at \*19 n.12. We use the two terms interchangeably here, or simply refer to them as "constructive transfers" because of Bayview's S corporation status and the differing tax treatment thereof as described in section 1368.

**[\*19]** whether the shareholder or the corporation primarily benefits is a question of fact. *Id.* at 180. To avoid having a distribution treated as a constructive distribution, the taxpayer must show that the corporation primarily benefited from the distribution. *See id.* at 181. The crucial concept in a finding that there is a constructive distribution is that the corporation has conferred a benefit on the shareholder to distribute available earnings and profits without the expectation of repayment. *CTM Constr., Inc. v. Commissioner*, T.C. Memo. 1988-590, 1988 Tax Ct. Memo LEXIS 619, at \*11 ("Generally, a constructive distribution occurs when corporate assets are diverted to or for the benefit of a shareholder without adequate consideration for the diversion." (citing *Sammons v. Commissioner*, 472 F.2d 449 (5th Cir. 1972), *aff'g in part, rev'g in part* T.C. Memo. 1971-145)); *see also Magnon v. Commissioner*, 73 T.C. 980, 994 (1980) ("The crucial test of the existence of a constructive dividend is whether 'the distribution was primarily for the benefit of the shareholder.'").

### A. *Constructive Distributions of Appreciated Property*

In 2008 Bayview transferred Lot 1 to Mr. Messick and Lot 2 to Ravenna without receiving any consideration in return.[11] Respondent determined that the transfers constituted constructive distributions of appreciated property to petitioners as shareholders of Bayview followed by gifts or compensatory transfers to Mr. Messick, as their friend and business associate, and Mr. Smith, as their son-in-law and the sole member of Ravenna.[12] He subsequently adjusted petitioners' income to reflect their pro rata share of built-in capital gains deriving from the

---

[11] At trial petitioners moved to submit evidence of respondent's examination of their tax returns along with a deposition from the examining agent (later identified as respondent's Rule 81(c) designee) arguing it was relevant in demonstrating that petitioners received no consideration in exchange for Bayview's property transfers to Mr. Messick and Ravenna. Respondent did not dispute and in fact agreed that no consideration had been exchanged. Respondent filed a Motion in Limine to preclude the evidence on grounds of relevance by contending that this fact is not in dispute. We agree with respondent and will therefore grant his Motion.

[12] On brief, petitioners argue for the first time that respondent's determinations relating to Bayview's constructive distributions of appreciated properties were not reflected in the notice of deficiency. Again, we need not consider an argument raised for the first time on brief. *Estate of Mandels*, 64 T.C. at 73. We nevertheless observe that the Stipulations of Fact reflect amounts received for appreciated property from Bayview in the 2008 capital gain adjustment.

**[\*20]** constructive distributions of the properties.[13] Noting that petitioners contend and therefore bear the burden of proving that Bayview, rather than petitioners, benefited from the transfers of Lots 1 and 2, we turn to the parties' contentions.

1. *Lot 1*

Respondent contends that petitioners primarily benefited from Bayview's transfer of Lot 1 because the transfer was designed to assist their friend and business partner Mr. Messick when he needed cash to finance his floundering businesses. Respondent's argument rests on the suggestion that petitioners permitted Mr. Messick to use Lot 1 as collateral for a mortgage so that he could use the proceeds therefrom to finance his own companies' business operations. To support this position, he highlights several allegedly unrelated business dealings between petitioners and Mr. Messick, which included construction work, consulting projects, and prior exchanges of property. Respondent posits that when considering the relationship between Mr. Messick and petitioners as well as the numerous transactions between Bayview and WLM Management, it should be of no consequence that Bayview would transfer a parcel of real property directly to Mr. Messick to serve as compensation for a previous transaction or service or to assist him financially during a time of need.

Petitioners maintain that Bayview's transfer of Lot 1 to Mr. Messick was intended as a seller-financed installment sale whereon Mr. Messick failed to make agreed-upon payments. They contend that neither they nor Bayview received any benefit from the transfer because of the lack of consideration. According to them, Lot 1 was deeded to Mr. Messick pursuant to a formal sale agreement whereby Mr. Messick promised to make three payments totaling $895,000 within four months of receiving title to the property. They explain that the original plan was for Mr. Messick to borrow against the property and thereafter pass the necessary proceeds along to Bayview to cover the purchase price. They profess to have been comfortable with this arrangement because Mr. Messick had proven himself trustworthy throughout their 15-year relationship. However, this trust was ostensibly misplaced because after he obtained title to the property Mr. Messick used it for his personal benefit and failed to make any of the scheduled payments to Bayview. Petitioners claim to have considered causing Bayview to

---

[13] This adjustment reflects the proper computation when an S corporation has no accumulated earnings or profits. *See* I.R.C. § 1368(b).

[*21] pursue Mr. Messick in litigation but ultimately decided against it. They believed litigation was unlikely to yield any recovery and "would be just throwing good money after bad" on account of Mr. Messick's financial situation.

In view of the amount involved it is simply unreasonable for prudent businesspersons, as we assume petitioners and Bayview to be, to enter an agreement to sell a high-value asset and thereafter decline to pursue the $895,000 compensation to which they are entitled. It is far more likely that this transfer served as compensation to Mr. Messick with respect to some act which petitioners have placed an $895,000 value on or as a gift based on their personal relationship to assist him through his financial woes. Be that as it may, petitioners have not demonstrated what benefit Bayview received in return for its effectively gratuitous transfer of Lot 1 to Mr. Messick. Bayview's decision not to enforce the $895,000 obligation Mr. Messick purportedly was required but failed to pay weighs heavily against petitioners in this regard. In addition, any potential benefit to Bayview was precluded following Mr. Messick's acquisition of a loan using Lot 1 as collateral, his failure to make payments thereon, and the lender's subsequent foreclosure on the lot. Mr. Messick effectively sold Lot 1 to a third party without having to pay Bayview anything in exchange. On the basis of these considerations, we find that petitioners failed to demonstrate that Bayview's transfer of Lot 1 to Mr. Messick was made primarily for the benefit of Bayview rather than themselves. Consequently, we hold that the transfer constituted a constructive distribution of appreciated property from Bayview to petitioners.

2.      *Lot 2*

Respondent maintains that petitioners primarily benefited from Bayview's transfer of Lot 2 to Ravenna because their son-in-law (and by extension, their daughter) received full ownership of Lot 2 without providing any consideration in return. He asserts that petitioners' claim of an oral agreement between Bayview and Ravenna to form a joint venture for purposes of selling Lot 2 has no merit because the arrangement lacked any attributes of a true joint venture. Since Bayview did not become a member of Ravenna along with Mr. Smith, respondent argues that Bayview relinquished any and all rights it had in Lot 2, which both weighs against a finding of a true joint venture and precludes a nontaxable contribution of property under section 721(a). Respondent further supports his position by pointing to the absence of a written agreement showing (1) what Bayview risked if Ravenna lost

**[\*22]** Lot 2 through foreclosure or forced sale by a creditor; (2) that Bayview had any authority to prevent Ravenna from selling, mortgaging, or conducting any other activity with respect to Lot 2; and (3) what Ravenna contributed to the joint venture. Respondent's alternative position centers on the notion that although Bayview received no consideration in exchange for Lot 2, the deed of sale recorded a purchase price of $895,000 and that such a figure was not merely registered for "ceremonial deed purposes" as petitioners insist. By recording this purchase price on the "ceremonial" deed of sale, respondent alternatively contends that the transfer primarily benefited petitioners because it enabled them to artificially inflate the value of the property and the values of surrounding property owned by Bayview.

As mentioned above, petitioners contend that the transfer of Lot 2 to Ravenna was made pursuant to a valid oral agreement to form a joint venture whereby Mr. Smith, as the sole owner of Ravenna, agreed to contribute his services by attempting to sell the property; if the property sold, 80% of the profits were to be distributed to Bayview with the other 20% distributed to Ravenna, but if it did not sell, Ravenna was to transfer the property back to Bayview. Because a joint venture was formed, petitioners assert that Bayview's transfer of the lot to Ravenna constituted a nontaxable contribution of property under section 721(a). In support of this position petitioners cite several cases for the proposition that, under Virginia state law, joint ventures involving the purchase and sale of real estate may be formed by oral agreement. Petitioners assert that Mr. Smith was unable to sell Lot 2 because of the declining real estate market in 2008, and in 2012 he conveyed his interest in Ravenna to Bayview, which effectively returned Lot 2 to Bayview and ended their joint venture. Petitioners maintain that they never received any ownership interest in Lot 2 in their individual names and therefore they did not receive any personal benefit or accession to wealth or derive any readily realizable economic value as a consequence of Bayview's transfer of Lot 2 to Ravenna.

Joint ventures are the equivalent to partnerships for federal tax purposes. *See* I.R.C. § 7701(a)(2). "A partnership is generally said to be created when persons join together their money, goods, labor, or skill for the purpose of carrying on a trade, profession, or business and when there is community of interest in the profits and losses." *Commissioner v. Tower*, 327 U.S. 280, 286 (1946). "A partnership is, in other words, an organization for the production of income to which each partner contributes one or both of the ingredients of income—capital or services." *Commissioner v. Culbertson*, 337 U.S. 733, 740 (1949). To

**[\*23]** decide whether a partnership exists, a court must also analyze the relevant facts to determine whether "the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." *Id.* at 742. We evaluate a joint venture "by reference to the same principles that govern the question of whether persons have formed a partnership which is to be accorded recognition for tax purposes." *Luna v. Commissioner*, 42 T.C. 1067, 1077 (1964). These principles require us to consider a number of factors, none of which is conclusive, that include: the contributions, if any, made by both parties to the venture; the parties' control over capital and income and the right of each party to make withdrawals; whether each party shared a mutual proprietary interest in the net profits and had an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income; and whether the parties exercised mutual control and assumed mutual responsibilities of the venture. *See id.* at 1077–78.

Applying these factors to the facts and circumstances before us, we find that the arrangement between Bayview and Ravenna to sell Lot 2 did not qualify as a joint venture for tax purposes. Firstly, while Ravenna's plan to contribute services may have amounted to a requisite contribution to form a joint venture, *see, e.g.*, *Carnegie Prods., Inc. v. Commissioner*, 59 T.C. 642, 652 (1973), the fact that Bayview's sole role in the venture was to contribute property weighs against a finding favorable to petitioners, *see Ewing v. Commissioner*, 20 T.C. 216, 231–32 (1953), *aff'd*, 213 F.2d 438 (2d Cir. 1954). Secondly, and most significantly, Bayview did not retain any legal rights in Lot 2, the sole underlying asset of the alleged joint venture, after transferring it to Ravenna. Bayview may have retained some of its legal rights in Lot 2 by contributing it to Ravenna in exchange for an interest in Ravenna but that is not what occurred here. Instead, Bayview transferred fee simple title of the lot to Ravenna, which means that Ravenna received the full bundle of rights that attach to property ownership unencumbered by any legitimate restriction or detriment and was free to do with the lot as it wished. Following the transfer, Ravenna had the sole right to possession, could sue third parties for nuisance or trespass, could develop or erect improvements on the land, was responsible for property taxes, and could have mortgaged the property without the consent of a third party. *See, e.g.*, *Musgrave v. Commissioner*, T.C. Memo. 2000-285, 2000 WL 1258400, at \*5. In effect, the transfer gave Ravenna sole control over capital and income in the property, sole responsibility for the sale of the property, and sole interest in the net profits of the sale, if it so chose. This type of arrangement does not rise

[*24] to the valid formation of a joint venture for federal income tax purposes. For this reason, we find that Bayview's gratuitous transfer of Lot 2 to Ravenna does not constitute a nontaxable contribution of property under section 721(a).

Bayview itself received no benefit at the time it transferred Lot 2 to Ravenna. The fact that the lot was returned to Bayview in 2012 does not retroactively erase the fact that Bayview relinquished its rights in the lot in favor of Ravenna in 2008. With respect to respondent's alternative argument, petitioners conceded that the $895,000 consideration recorded on the deed was used as a benchmark for potential purchasers to take into account before negotiating a future purchase price for the property. Therefore, at minimum, it is plausible that petitioners received a personal benefit by artificially inflating the value of the property to assist Ravenna (and their son-in-law by attribution) in retrieving a higher price for Lot 2. In the light of the foregoing, we find that petitioners failed to demonstrate that Bayview's gratuitous transfer of Lot 2 to Ravenna was made primarily for the benefit of Bayview. Accordingly, we hold that this transfer also constitutes a constructive distribution of appreciated property from Bayview to petitioners.

B.   *Constructive Dividend from Petitioners' Rent-Free Use of Home Owned by Bayview*

Respondent determined that petitioners' rent-free use of the home owned by Bayview during the years in issue constituted a constructive dividend from Bayview to petitioners equal to the $24,000 per year fair rental value of the property. It is well settled that a shareholder's use of corporate property can result in a constructive dividend to him measured by the fair market rental value of the property. *Nicholls, North, Buse Co. v. Commissioner*, 56 T.C. 1225, 1240–42 (1971). Petitioners concede to residing in the home during that time without paying rent to Bayview and do not argue against the determination that their residence there constitutes a constructive dividend. Instead, they argue that an 87% reduction should be applied to the stipulated value of the constructive dividend on the basis of their self-serving testimony that they lived in only 13% of the home. We do not find this argument persuasive, and we have no obligation to accept uncorroborated self-serving testimony. *Tokarski v. Commissioner*, 87 T.C. 74, 77 (1986). In addition, petitioners have stipulated the amount of the constructive dividend and Rule 91(e) requires that we bind them

**[\*25]** to this stipulation absent clearly contrary evidence.[14] *See Jasionowski v. Commissioner*, 66 T.C. 312, 318 (1976) (holding that the Court has discretion not to be bound by the stipulation of facts where clearly contrary evidence is presented at trial). Consequently, we conclude petitioners' rent-free use of the home constitutes a constructive dividend from Bayview to petitioners in the amount stipulated by the parties.

V.    *Bad Debt Deduction*

Respondent disallowed Bayview's bad debt deduction of $227,420 after determining the debt was not valid.[15] It arose from a worthless loan Bayview claimed to have made to Village Builders. This adjustment flowed through to petitioners' individual tax returns. Section 166(a)(1) allows a deduction for any debt that becomes wholly worthless within a taxable year. To deduct a business bad debt, the taxpayer must show that the debt was created or acquired in connection with a trade or business and must also establish the amount of the debt, the worthlessness of the debt, and the year that the debt became worthless. *Davis v. Commissioner*, 88 T.C. 122, 142 (1987), *aff'd*, 866 F.2d 852 (6th Cir. 1989). An intent to establish a debtor-creditor relationship exists if, when the transfers were made, the debtor intended to repay the funds and the creditor intended to enforce repayment. *See, e.g.*, *Beaver*, 55 T.C. at 91; *Fisher v. Commissioner*, 54 T.C. 905, 909–10 (1970). This is a question of fact to be determined upon consideration of all pertinent facts. *Haber v. Commissioner*, 52 T.C. 255, 266 (1969), *aff'd*, 422 F.2d 198 (5th Cir. 1970).

Caselaw has established objective factors to consider when answering the question of whether a bona fide debtor-creditor

---

[14] The parties have also stipulated the resulting tax consequences if the Court determined petitioners' rent-free use of the home constitutes a constructive dividend.

[15] Petitioners contend on brief that the notice of deficiency adjusted their 2008 income to include $227,420 in "loan forgiveness" rather than disallow a bad debt deduction and as a result this determination was made contrary to the evidence. However, the parties stipulated that the notice contained an adjustment for the disallowance of a bad debt deduction claimed by Bayview. We find this stipulation clarified the "loan forgiveness" phrase in the notice, because of the identical amount. We also note that Statement 1 on Bayview's 2008 Form 1120S characterized the bad debt deduction as "loan forgiveness," and the adjustment in the notice merely offset the deduction. In any event, we will again bind petitioners to the stipulation because the evidence presented at trial did not clearly contradict it. *See Jasionowski*, 66 T.C. at 318.

[*26] relationship exists. Those factors include (1) whether the promise to repay is evidenced by a note or other instrument that evidences indebtedness; (2) whether interest was charged or paid; (3) whether a fixed schedule for repayment and a fixed maturity date were established; (4) whether collateral was given to secure payment; (5) whether repayments were made; (6) what the source of any payments was; (7) whether the borrower had a reasonable prospect of repaying the loan and whether the lender had sufficient funds to advance the loan; and (8) whether the parties conducted themselves as if the transaction was a loan. *Dixie Dairies Corp. v. Commissioner*, 74 T.C. 476 (1980); *see also Welch v. Commissioner*, 204 F.3d 1228, 1230 (9th Cir. 2000), *aff'g* T.C. Memo. 1998-121; *Estate of Mixon v. United States*, 464 F.2d 394, 402 (5th Cir. 1972); *Knutsen-Rowell, Inc. v. Commissioner*, T.C. Memo. 2011-65.

Respondent argues the arrangement between Bayview and Village Builders lacked the objective formalities required of a bona fide debt—there was no written agreement, payment schedule, nor interest paid—and, since the transfer was not a bona fide debt, it is impossible to determine whether the debt became worthless. Furthermore, respondent adds that Village Builders failed to include cancellation of debt income on Line 10, Other Income, of its 2008 Form 1120 as the 2008 Instructions for Form 1120 require. On the other hand, petitioners maintain that the debt between the two corporations was a valid debt because (1) Village Builders had repaid "hundreds of thousands of dollars" of funds lent to it by Bayview; (2) there was a reasonable prospect of loan repayment due to Village Builders' history of repaying loans from Bayview; and (3) the parties conducted themselves as if the loan was a valid debt as shown by Village Builders' reporting of the forgiven debt as income. Petitioners contend that Village Builders reported $263,053 of taxable income for 2008 and that $227,420 of that income accounted for cancellation of debt income. They point to Village Builders' balance sheet and adjusted journal entries for tax year 2008 as additional evidence that Village Builders reported the forgiven debt as cancellation of debt income.

We find that several of the factors above weigh against a conclusion that petitioners' corporations maintained a bona fide debtor-creditor relationship. Nothing in the record shows that the corporations kept a written agreement evidencing the debt, interest to be paid, a repayment schedule, or a maturity date. Nor is there any indication that the corporations conducted themselves as if the transaction was a loan. According to petitioners, Village Builders never formally

**[\*27]** requested a loan from Bayview. Instead, Mr. Starer described how Village Builders would request a loan from Bayview by testifying that "Bob Starer, CEO of Village Builders, would say to Bob Starer as CEO of Bayview Corporation, 'let me have some money.'" Petitioners cannot create a deduction simply by deciding to record an intercompany debt without formalities and then canceling it. *See, e.g., Kelly v. Commissioner*, T.C. Memo. 2021-76, at \*61. Moreover, a review of Village Builders' 2008 Form 1120 shows no income reported on Line 10 as required by instructions to report cancellation of debt income. Thus, notwithstanding the failure to comply with loan formalities, Village Builders failed to correspondingly recognize cancellation of debt income on its own tax return, an omission sufficient for us to disallow Bayview's bad debt deduction considering that these are two related closely held corporations. Accordingly, we find that petitioners have failed to show that there was a bona fide debtor-creditor relationship between Bayview and Village Builders. On the basis of the foregoing, we sustain respondent's disallowance of Bayview's bad debt deduction.

VI. *Penalties*

Section 6662(a) and (b)(1) and (2) imposes a 20% penalty on any portion of an underpayment of tax required to be shown on a return that is attributable to negligence or disregard of rules or regulations or a substantial understatement of income tax. "Negligence" includes any failure to make a reasonable attempt to comply with the internal revenue laws or to exercise reasonable care in the preparation of a tax return. I.R.C. § 6662(c); Treas. Reg. § 1.6662-3(b)(1). "Disregard" includes any careless, reckless, or intentional disregard of the Code, regulations, or certain IRS administrative guidance. I.R.C. § 6662(c); Treas. Reg. § 1.6662-3(b)(2). An understatement of income tax is substantial if it exceeds the greater of 10% of the tax required to be shown on the return for the taxable year or $5,000. I.R.C. § 6662(d)(1)(A).

Under section 7491(c), the Commissioner bears the burden of production regarding penalties and must come forward with sufficient evidence indicating that it is appropriate to impose penalties. *Higbee v. Commissioner*, 116 T.C. 438, 446–47 (2001). Respondent will have met his burden of production with regard to section 6662 by showing that the deficiencies exceed the greater of 10% of the tax required to be shown on the return or at least $5,000 for each year the penalty has been determined following a Rule 155 computation. However, part of

**[\*28]** respondent's burden of production in this setting includes demonstrating compliance with section 6751(b).

Section 6751(b)(1) provides that "[n]o penalty . . . shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate." This case was tried and the record was closed before the issuance of our opinion in *Graev v. Commissioner*, 149 T.C. 485 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016). *Graev* sets forth the history of our interpretation of section 6751(b). After having earlier taken a contrary position, in *Graev* we held that the Commissioner's burden of production under section 7491(c) includes establishing compliance with the written supervisory approval requirement of section 6751(b). Following that decision, various Circuit Courts of Appeals have split over when such approval is required to be made, a discussion of which is unnecessary for the reasons set forth below. *Compare Kroner v. Commissioner*, 48 F.4th 1272 (11th Cir. 2022), *rev'g in part* T.C. Memo. 2020-73, *and Laidlaw's Harley Davidson Sales, Inc. v. Commissioner*, 29 F.4th 1066 (9th Cir. 2022), *rev'g and remanding* 154 T.C. 68 (2020), *with Chai v. Commissioner*, 851 F.3d 190 (2d Cir. 2017), *aff'g in part, rev'g in part, and remanding* T.C. Memo. 2015-42.

In the instant case, respondent did not file a motion to supplement the record addressing the effect of section 6751(b) on this case. Neither did he direct the Court on brief or otherwise to any evidence of section 6751(b) supervisory approval in the record. Consequently, respondent has failed to satisfy his burden of production to establish compliance with section 6751(b); therefore, petitioners are not liable for accuracy-related penalties under section 6662.

The Court has considered all of the arguments made by the parties, and to the extent they are not addressed herein they are considered unnecessary, moot, irrelevant, or otherwise without merit.

To reflect the foregoing,

*An appropriate order will be issued granting respondent's Motion in Limine, and decision will be entered under Rule 155.*